**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ronald Leon WHITE, Defendant–Appellant.**

No. 89–1598.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1989.

Decided May 24, 1990.

Bruce E. Reppert, Asst. U.S. Atty., Office of the U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Renee E. Schooley, Federal Public Defender, Office of the Federal Public Defender, United States Court & Custom House, St. Louis, Mo., for defendant-appellant.

Before CUMMINGS, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Ronald Leon White appeals his sentence following his convictions resulting from his pleas of guilty to two counts of kidnapping under 18 U.S.C. § 1201(a)(1) and one count of interstate transportation of a stolen motor vehicle in violation of 18 U.S.C. § 2312. We affirm.

## I.

This case stems from a crime spree that took place in three states (Missouri, Illinois and Indiana) after the defendant White's escape on June 6, 1988, from a medium-security penal institution known as the St. Louis Work House located in St. Louis, Missouri. White was employed in the prison's kitchen and escaped during a milk delivery to the prison. During White's escape from the prison, White wielded an eleven-inch butcher knife and stabbed a dairy company employee while taking over the company's dairy delivery truck. After exiting the prison confines White parked the truck in an alley in the city of St. Louis.

White then went on a crime spree with his initial crimes being perpetrated in St. Louis, Missouri. White offered a residential occupant twenty dollars for a ride, and then requested his driver to pick up his (White's) girlfriend. Shortly thereafter, White flashed his knife, stated that he had escaped from the Work House and advised

the driver he was a hostage. At that point, the driver drove his car into the side of a building and escaped from White. After the automobile was totaled in the accident, White unsuccessfully sought to steal a truck.

Early in the morning of June 7, 1988, White entered the residence of two minor girls (sisters) whose parents were out of town. White placed one of the girls in the closet while he allegedly repeatedly raped the other girl. In addition, he ransacked the house in search of money and valuables. On the afternoon of June 7, 1988, twelve hours after his entry into the home, White forced one of the girls to call a male friend who owned a car. This friend drove to the sisters' house and, upon arrival, White restrained him with rope. The girl who had called her friend was then forced to drive White to a bank to withdraw money from her mother's account. While they were in the auto at the drive-up window, the girl driving escaped. White then drove the stolen auto to Washington University of St. Louis. The government argued that White chose Washington University as his destination because of White's desire to change autos, likely making apprehension more difficult, and to steal the automobile of the mother of one of the girls White had victimized. One of the sisters had mentioned that her mother worked at Washington University of St. Louis. White, when apprehended, was found in possession of the mother's car keys.

The crimes alleged in the federal indictment began when White arrived at Washington University. At about 4 p.m. on June 7, 1988, a woman who worked in the admissions office at the University was leaving work and came upon White, attired in a jogging suit he had stolen from the sisters' home. As White approached the woman, he stated he was unable to get his car started and asked for help in jump starting his car and the woman agreed. White entered the woman's car and accompanied her to the parking lot where the car White had stolen was parked. White opened the trunk but said there were no jumper cables and requested that the wom-

an take him to a gas station. The woman acquiesced, and upon their arrival at the gas station, White changed his mind and requested that she take him to a tavern. She complied, but at this time White again changed his mind and requested that he be taken to his home. The woman entered an interstate highway heading downtown, whereupon White pulled a knife and identified himself as an escaped prisoner. At this time, he ordered her to drive him to Chicago, and she complied. During the course of the trip White held the butcher knife in his hand. After crossing into Illinois, the woman escaped by rolling out of the auto onto the interstate highway while the car was travelling at an estimated speed of 55 m.p.h. White gained control of the woman's car and drove it to a gas station at the Highland, Illinois exit.

Upon arriving at the gas station, White encountered the station's lone attendant, a man in his sixties who suffered from respiratory (breathing) problems. White asked the attendant where the attendant's car was and the attendant stated his wife had dropped him off at work. Upon learning this fact, White directed the attendant at knife point to drive the Washington University employee's car toward Indianapolis. White and the attendant arrived in Indianapolis at about 2 a.m. on June 8, 1988, and checked into a motel. White tied the gasoline attendant up in the motel room and he departed from the motel at 9 a.m. that same morning.

Shortly thereafter the F.B.I. learned that White might be headed toward Ft. Wayne, Indiana. The F.B.I. and Indiana State Police arrived at an address in Ft. Wayne and discovered the reported stolen car of the Washington University employee, but White was not at the scene. Later, when an individual matching White's description entered the car, one of the agents approached the car and identified himself as an F.B.I. agent. At this time White jumped into the stolen car and started out on a high-speed chase (20 minutes) through Ft. Wayne residential areas at speeds approaching 80 to 90 m.p.h. During the chase White ran red lights and stop signs, drove on sidewalks, in and out of yards and

side-swiped other vehicles while endangering the lives of three pedestrians. He also endangered the life of a motorcycle officer when he forced the officer to swerve to avoid colliding with him. Fearing possibly fatal injuries to innocent pedestrians, as well as law enforcement personnel, the Ft. Wayne police officer in command gave one of the officers permission to ram White in the stolen car. The officer did so, forced the car to flip over and left it standing on end. Thereupon, roughly twenty officers jumped from their vehicles and drew their weapons as White was exiting the car. White surrendered at this time. In a statement given to officers following his arrest, White admitted to kidnapping the woman at Washington University but made no mention of the kidnapping of the Illinois gas station attendant.

## II.

This case involves the review of a district court's application of the United States Sentencing Commission Guidelines (the "Guidelines") in a sentencing determination under the Sentencing Reform Act of 1984. "We review a district court's factual findings in determining an appropriate criminal sentence for clear error. 18 U.S.C. § 3742(e); *United States v. Herrera,* 878 F.2d 997, 999–1000 (7th Cir.1989)." *United States v. Jordan,* 890 F.2d 968, 972 (7th Cir.1989). Each of the Guidelines application questions presented involve "essentially questions of fact for the district court to resolve from a variety of sources." *Id.* "[W]e will affirm the district court if it correctly applied the Guidelines to findings of fact that do not leave us ' "with the definite and firm conviction that a mistake has been committed." ' *Herrera,* 878 F.2d at 1000 (citations omitted)." *Jordan,* 890 F.2d at 972.

## III.

▇ White's initial challenge to the district court's application of the guidelines centers upon the court's addition of a two level adjustment for obstruction of justice under Guidelines Section 3C1.1 to the calcu-

lations of the offense level on each of the three counts upon which White was sentenced. In applying this adjustment the court relied upon White's continuing flight from authorities, especially his high-speed chase when threatened with apprehension in Ft. Wayne, Indiana. White argues that the flight alone cannot provide a basis for application of the obstruction of justice adjustment. Instead, White urges that the obstruction of justice adjustment requires some type of interference with an ongoing state criminal investigation or judicial proceeding (i.e., destruction of evidence relevant to an investigation).

Although flight from or resistance to a lawful arrest is not one of the specifically enumerated examples of obstruction of justice noted in the Sentencing Commission's Application Note 1 accompanying § 3C1.1 of the Guidelines, the Commission's failure to include this type of conduct is neither decisive nor conclusive. The Application Note in clear and unambiguous language states that "[t]he following conduct, *while not exclusive, may* provide a basis for applying [the obstruction of justice] adjustment." Sentencing Guideline § 3C1.1, comment. (n. 1) (emphasis added). *Cf. United States v. Stokley,* 881 F.2d 114, 116 (4th Cir.1989) (In construing the Application Note to Guideline Section 1B1.1 defining "physically restrained" the court noted that "[b]y use of the words 'such as,' it is apparent that 'being tied, bound or locked up' are listed by way of example rather than limitation"). The drafters of the commentary to the Sentencing Guidelines recognized the obvious inability of any group drafting guidelines to encompass and list each and every example of obstruction of justice, and we do not believe that their failure to include "flight from arresting officers" as an example of conduct constituting obstruction of justice is either persuasive or particularly significant.

The question of whether flight from arresting officers constitutes obstruction of justice under Section 3C1.1 has been the subject of previous judicial decisions. In *United States v. Velasquez–Mercado,* 872 F.2d 632, 636 n. 3 (5th Cir.1989), the Fifth Circuit explicitly observed that "it remains

an open question whether fleeing or hiding, in themselves, can constitute obstruction of justice under aggravating level § 3C.1.1 [of the Sentencing Guidelines]." However, Fifth Circuit cases have determined that flight, in conjunction with other factors, such as destruction of evidence, can provide a basis for an obstruction of justice adjustment. For example, in *United States v. Galvan–Garcia,* 872 F.2d 638, 641 (5th Cir.1989), the court in approving an obstruction of justice adjustment noted: "Because of the actions of Galvan–Garcia in attempting to conceal the marijuana by tossing the bags out of the window of his vehicle, and in fleeing from the Border Patrol agents, the district court applied the above guideline to increase the offense level for Galvan–Garcia." Similarly, in *United States v. Franco–Torres,* 869 F.2d 797, 800 (5th Cir.1989), the court found it unnecessary to pass upon the contention "that efforts to evade arresting officers cannot, without more, constitute the obstruction of justice within the meaning of § 3C1.1." The court relied specifically upon the facts that the defendant "threw away [a] gun to hide it from the investigating officers," and "shot at [an agent] who was not only a police officer but a witness to the crime," as evidence sufficient to support the district court's obstruction of justice determination. *Id.* Finally, in a case very similar factually to ours, *United States v. Tellez,* 882 F.2d 141, 143 (5th Cir.1989), the Fifth Circuit determined that an obstruction of justice adjustment under section 3C1.1 was justified in a case where the defendant's "attempted flight ... endangered not only the life of the arresting officers but the lives of innocent bystanders," and where the defendant made "vigorous efforts to resist arrest after his vehicle crashed into a guard rail."

The Second Circuit in *United States v. Stroud,* 893 F.2d 504, 507 (2nd Cir.1990), recently determined that "mere flight in the immediate aftermath of a crime, without more, is insufficient to justify a section 3C1.1 obstruction of justice enhancement." *Stroud,* 893 F.2d at 507. The court reasoned that "mere flight" did not in itself

constitute the "willful" obstruction of justice required under section 3C1.1 of the Guidelines. *Id.* However, the Second Circuit specifically distinguished the *Tellez* case where it perceived that "instinctual flight, due to its duration or acts occurring in the course thereof ripen[ed] into a willful attempt to impede or obstruct the administration of justice." *Id.* at 508. As an example of such a case, the Second Circuit cited *Tellez* noting that in *Tellez* there was an "attempted vehicular escape from custody, 'which endangered not only the life of the arresting officer but the lives of innocent bystanders.'" *Id.* (quoting *Tellez*, 882 F.2d at 143). Thus, both the Second and Fifth Circuit decisions clearly provide authority for our holding that an obstruction of justice adjustment is proper under section 3C1.1 of the Guidelines where the facts demonstrate clear physical endangerment of others whether it be law enforcement personnel and/or innocent bystanders, and in this factual situation we have the combination.

The facts of this case demonstrate physical endangerment to the lives of both police officers and innocent bystanders that courts have held sufficient to support an obstruction of justice adjustment under Section 3C1.1 of the Guidelines. While in his attempted flight from prosecution, White transported a stolen motor vehicle from St. Louis, Missouri, through three states, to Ft. Wayne, Indiana. Upon ascertaining that White was in Ft. Wayne, Indiana, federal authorities placed White's automobile under surveillance. When White returned to his vehicle and was met by federal agents, rather than surrender, he led federal, state and local law enforcement personnel in the 15– to 20–minute, life-endangering, high-speed chase. During the high-speed chase White drove through a residential area at speeds of between 80 and 90 m.p.h., ran red lights and stop signs, drove upon sidewalks and through yards while side-swiping and colliding with other vehicles. Further, White swerved toward pedestrians and a motorcycle officer endangering their lives. In fact, the chase was so dangerous in nature that the Ft. Wayne supervising police official

gave permission and direction to an officer to ram White's stolen car and force it off the road to avoid further immediate danger of serious injury and/or loss of life. The chase ultimately did end after an officer ran White's car off the road.

Confronted with this factual scenario, we are of the opinion that the district court judge properly concluded that White's attempt to evade arrest in this manner clearly "imped[ed] the [criminal] investigation" into White's conduct, of which White's arrest was an integral part. In so holding, the district court observed: "We admittedly are plowing a lot of new ground in applying these guidelines and will be for some years to come, I suspect, and I think we have to rely on some type of a common sense interpretation to determine the intent of the drafters of this. It seems to me from what I know of this case that the adjustment for obstruction of justice is appropriate...." We agree with the trial judge that in the course of the application of the sentencing guidelines, as in the application of any legal concept, the use of "common sense" is more than just relevant, but required. "[W]e are mindful of what Mr. Justice Holmes stated in *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 336, 73 L.Ed. 722 (1929): '[t]here is no canon against using common sense in construing laws as saying what they obviously mean.'" *United States ex rel. Garcia v. O'Grady,* 812 F.2d 347, 355 (7th Cir.1987). The district court's conclusion that evasion of arrest in this factual scenario during a high-speed chase that endangers the lives of both police officers and innocent bystanders constitutes "obstruction of justice" under § 3C1.1 of the Sentencing Guidelines is a particularly appropriate application of "common sense," and we also hold that White's evasion of arrest constituted obstruction of justice under the Guidelines. We wish to point out that we would agree that mere flight without the attendant almost mortal circumstances in this case, including but not limited to the high speed chase through a heavily populated residential area endangering the lives, limbs and property of innocent pedes-

trians and law enforcement personnel, might not constitute "obstruction of justice." But, when considering the totality of the circumstances and his conduct, we are convinced that it clearly rises to the level of and fits within the parameters of the obstruction of justice adjustment applied in the trial court.

## IV.

■ White challenges the two level adjustment for a vulnerable victim under § 3A1.1 of the Guidelines. This adjustment was given with respect to the kidnapping count involving the gasoline station attendant on the ground that the attendant, who was in his sixties and experienced respiratory problems, was a vulnerable victim. White's position is that the victim's vulnerability had nothing to do with his (White's) decision to kidnap him because the attendant was the only individual at the gas station and he would have kidnapped any individual who had been working at the station. The government asserts that the victim's age and physical infirmities played a part in White's decision to kidnap him because, in the government's view, White likely would have had a far more difficult time and may have in fact been unable to successfully kidnap a younger or healthier individual who might have been able to run and successfully flee from the knife-wielding White. The Court determined that the victim's age (the victim was in his 60s) and health (the victim had respiratory problems) provided a sufficient factual basis for the application of the two level vulnerable victim adjustment under § 3A1.1 because White might have had difficulty in abducting a younger or healthier individual.

In approaching the "vulnerable victim" determination, we are guided by the Fifth Circuit's observation that:

" '[V]ulnerability' is the sort of fact which the trial court is peculiarly well-positioned to gauge, particularly in instances when the trial court has had an opportunity to observe the victim in court. In general, vulnerability is a complex fact dependent upon a number of characteristics which a trial court could not possibly

articulate completely. Certainly, a judgment as to vulnerability is not reducible to a calculation of the victim's age or to a diagnosis of the victim's disease."

*United States v. Mejia–Orosco,* 868 F.2d 807, 809 (5th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989) (per curiam) (decision on rehearing) (dicta). Furthermore, "[g]uideline § 3A1.1 imposes an adjustment for victim vulnerability 'on the basis not only of what the defendant knew, but also on the basis of what [he] then *should have known.'* " *United States v. Salyer,* 893 F.2d 113, 117 (6th Cir.1989) (quoting *Mejia–Orosco,* 868 F.2d at 810) (emphasis in *Mejia–Orosco* ).

From our review of the crime spree episode in this record, it is not only reasonable but logical to believe that White decided upon the gasoline station attendant as a kidnap hostage after having observed his advanced age and respiratory problems that rendered him unable to resist and flee from his attack. Armed with only a knife, it was necessary that he (White) possess a greater physical advantage over the person he chose to kidnap than had he been armed with a firearm. It is obvious that people of advanced years in general are less capable of resisting attack than are younger people. Based upon these facts, providing the required due deference to the trial court's factual determinations and noting the Fifth Circuit's observation that " 'vulnerability' is the sort of fact which the trial court is particularly well-positioned to gauge," *Mejia–Orosco,* 868 F.2d at 809, we hold that the district court appropriately applied the "vulnerable victim" adjustment to White's kidnapping of the gas station attendant.

## V.

■ With respect to both of the kidnapping counts the district court applied the four level increase for a kidnapping to facilitate the commission of another offense under Guideline § 2A4.1(b)(5). In finding that both kidnappings were committed to facilitate White's escape and subsequent unlawful flight from prosecution the district court found:

"It seems to me clearly that the kidnappings were part of the escape. [White] wanted to flee, he got out of the jail, he wanted to flee the area, he knew that he was going to be—if he stayed in the St. Louis area, he was going to be apprehended, and I think the kidnappings were part of the escape, and ... to facilitate the commission of another crime, the flight to avoid prosecution."

White's initial objection to this reasoning is that his escape had been completed prior to the kidnappings that occurred twenty-four hours after the escape. White's contention is unpersuasive. Guideline § 1B1.3(a)(1) defines relevant conduct for purposes of the kidnapping guideline as

"all acts and omissions committed or aided and abetted by the defendant or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of the offense; ...."

We agree with the district court that the kidnappings were committed in the course of White's attempts to avoid apprehension and detection during and after his escape from the Work House. White had escaped from the immediate confines of the Work House, but because he was obviously being pursued by law enforcement officers, his escape and subsequent limited freedom from custody certainly was not an accomplished fact. These kidnappings were also committed during the course of White's interstate flight from prosecution and involved persons who were required to drive the vehicles utilized in this flight in order that White might be able to hide below the window level if spotted by a law enforcement officer and not be as easily recognized in the driver's seat of the stolen cars. Thus, irrespective of the fact that the kidnappings took place twenty-four hours after White escaped from the Work House, the uninterrupted scenario makes it most evident that the kidnappings were done in furtherance of White's continuous freedom following his escape and interstate flight

from prosecution as well as his obstruction of justice.

■ White goes on to argue that application of section 2A4.1(b)(5)(A) to him would result in a double penalty for his escape because the fact that he was an escaped prisoner was considered in determining his criminal history category under § 4A1.1(e) of the Guidelines. However, the effect of the two guidelines sections is not identical because the "escape" factor utilized to determine the criminal history category under § 4A1.1(e) applies to any and all crimes committed during an escape, while the adjustment for kidnapping to facilitate an escape under § 2A4.1(b)(5)(A) applies only in the very limited circumstance where a kidnapping is part of a course of conduct that actually contributes to the success of the escape itself. The two adjustments are quite different and in our opinion the district court properly construed the Guidelines in applying each of them to White. Thus, we are of the opinion that the district court appropriately ordered a four-level enhancement for both kidnapping counts on the basis that both kidnappings facilitated White's escape and flight from prosecution.

## VI.

■ In connection with both kidnapping counts the district court properly refused to provide White with a one-level reduction for release of his victims within twenty-four hours under Guideline § 2A4.1(b)(4)(C). White asserts that he permitted both of his kidnap victims to escape within twenty-four hours of their respective kidnappings and is, thus, entitled to the one-point reduction.

As White properly observes, the Sentencing Commission's application notes to Guideline § 2A4.1 state that the term " 'released' includes allowing the victim to escape." Guideline § 2A4.1, comment (n. 3). White ridiculously argues that he permitted the first kidnap victim to escape because he did not search for her after she escaped from the auto. With respect to the second victim, White contends that his action of merely leaving a man in his sixties,

in poor health, tied-up in an Indianapolis motel room, in effect, permitted the victim to escape. The trial court was of the opinion that White's actions in neither of these instances constituted acquiescence in the victim's escape. We agree with the trial judge's rulings.

With respect to the first kidnap victim, it was proper for the district court to conclude that White did not in fact permit her escape. The woman was forced to roll out of a speeding car allegedly traveling 55 m.p.h. on an interstate highway, and White argues that because he chose not to track her down after she had escaped his custody, he allowed her to escape. In our view the district court neither misapplied the guidelines nor mistakenly construed the facts in rejecting the argument that White's failure to search for a kidnap victim who escaped from a speeding automobile at great danger to her life constitutes the "permission to escape" necessary for a finding that the victim was "released" by the kidnapper.[1]

Similarly, we disagree with White's contentions and believe the guideline was appropriately applied in the case of the gasoline station attendant in an advanced aged condition and suffering from respiratory problems. He was left tied-up in a locked Indianapolis motel room where he might well have suffered any one of a number of medical and/or physical problems brought on by his age, difficulty in breathing and/or possible inability to obtain food or water. Thus, we are convinced that the trial court properly applied § 2A4.1(b)(4)(C) in refusing to provide the one-level decrease for release of the kidnapped victims within twenty-four hours.

## VII.

White goes on to argue that the district court improperly applied the theft guideline in granting a two-level upward adjustment for an offense involving "more than minimal planning" under § 2B1.1(b)(4) of the Guidelines. White asserts that he stole the car from the kidnap victim when the opportunity arose after his deceptive requests to the victim to merely give him a ride. He somehow fashions a ridiculous argument denying any real plan to steal the car. The government contends that White's continuous course of conduct following his escape demonstrates a very definite plan and scheme to flee the St. Louis area implemented at a minute's notice based on the facts and circumstances immediately present. The government further asserts that the discovery of White with the alleged rape victim's mother's car keys clearly establishes his purposeful scheme to steal that very vehicle from the Washington University area.[2] The Sentencing Guidelines present the following discussion concerning the meaning of the term "more than minimal planning":

" 'More than minimal planning' means more planning than is typical for commission of the offense in a simple form. 'More than minimal planning' also exists if significant affirmative steps were taken to conceal the offense.

'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

In an assault, for example, waiting to commit the offense when no witnesses were present would not alone constitute more than minimal planning. By contrast, luring the victim to a specific location, or wearing a ski mask to prevent identification, would constitute more than minimal planning.

In a commercial burglary, for example, checking the area to make sure no witnesses were present would not alone constitute more than minimal planning. By contrast, obtaining building plans to plot

---

1. We would also note that White may have failed to immediately track down the first kidnap victim because he chose not to follow her in fear that she might have already notified the police.

2. As noted previously, the record reflects that the mother worked at Washington University of St. Louis.

a particular course of entry or disabling an alarm system, would constitute more than minimal planning.

In a theft, going to a secluded area of the store to conceal the stolen item in one's pocket would not alone constitute more than minimal planning. However, repeated instances of such thefts on several occasions would constitute more than minimal planning. Similarly, fashioning a special device to conceal the property, or obtaining information on delivery dates so that an especially valuable item could be obtained, would constitute more than minimal planning.

In an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning. On the other hand, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, as with several instances of taking money, each accompanied by false entries."

Sentencing Guidelines § 1B1.1, comment. (n. 1(f)).

In applying the concept of "more than minimal planning," we note that it is for the district court to make the factual determination. We will treat the district court's determination with "due deference" and will reverse only if left "with a definite and firm conviction that a mistake has been committed." *Herrera*, 878 F.2d at 1000. In this case the theft of the Washington University employee's motor vehicle was not merely a whimsical crime, but was a crime committed as part of a planned attempt to flee the St. Louis area. Furthermore, the selection of Washington University as the locale for the theft obviously involved planning on White's part as he was apprehended with the keys to the car of another Washington University employee (the mother of the girls he had terrorized). In addition, White's elaborate scheme to avoid apprehension, including the changing from prison garb to a jogging suit, the concealing of a knife until he was ready to use it, having others drive the car so he could hide below window level when necessary, and his requests for rides to different locations in the St. Louis area demonstrate something more than minimal planning on his part. At White's request the kidnap victim initially drove White to his own automobile, then to a gas station, then to a tavern and then allegedly toward his home before her freedom of movement was restrained, she was kidnapped, forced to drive into Illinois and had her car stolen. We are convinced that the district court properly concluded that this combination of a kidnapping and theft to facilitate an escape and a rather elaborate theft scheme combined to require the conclusion that White's theft of the automobile involved more than minimal planning under § 2B1.1(b)(4) of the Guidelines. Thus, we uphold the district court's application of the two-level upward adjustment for a crime involving more than minimal planning.

## VIII.

White challenges the district court's provision of a two-level increase for restraint of the victim under Guideline § 3A1.3 in its calculation of the offense level applicable to the kidnapping count involving the abduction of the gasoline station attendant. Our review of the record reveals that White failed to raise this challenge in the trial court. It is well settled that "[t]o preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection." *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988). In the absence of a proper objection, the court's ruling may only be reversed if a "plain error" was committed. *Id.*

As we observed in *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984): "To be plain, an error must be conspicuous, at least in hindsight...." As we have also noted:

"A plain error is an error that is 'not only palpably wrong but [is] also likely to cause the outcome of the trial to be mistaken.' *United States v. Kehm*, 799 F.2d 354, 363 (7th Cir.1986). 'A reversal on the basis of plain error can be justi-

fied "only when the reviewing court is convinced that it is necessary in order to avert an actual miscarriage of justice." ' [*United States v. Requarth*, 847 F.2d 1249, 1254 (7th Cir.1988) ] (quoting *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985))."

*United States v. Dietrich*, 854 F.2d 1056, 1060 (7th Cir.1988).

As our recent decision in *United States v. Tholl*, 895 F.2d 1178, 1184–85 (7th Cir. 1990), demonstrates, the question of whether a "physical restraint" adjustment under section 3A1.3 of the Guidelines should be applied in a particular sentencing proceeding is not a simple one. Indeed, the question of whether the physical restraint adjustment can be applied in sentencing on a kidnapping conviction is, to our knowledge, a matter of first impression in reported Sentencing Guidelines decisions. The failure of White to object to this adjustment in the district court, thus not making the trial court aware of any legal challenge, rendered the trial court unable to analyze White's argument and/or theory regarding the physical restraint of the victim adjustment. In light of the difficulty and subtlety of this question and the fact that a colorable argument could be made that the "restraint of the victim" adjustment could apply in a kidnapping case, irrespective of whether we would hold the district court's decision to be proper if this issue had been adequately preserved, we hold that the district court's application of the "restraint of the victim" adjustment was neither "conspicuous error" nor "palpably wrong." Accordingly, the district court's application of the physical restraint adjustment under § 3A1.3 of the Guidelines was not "plain error."

### IX.

█ In sentencing White the district court applied the theft guideline found in § 2B1.1 to the transportation of a stolen motor vehicle count.[3] In its application of this guideline to the defendant the district court imposed a two-level upward adjustment for theft from the person of another under § 2B1.1(b)(3). The defendant-appellant challenges this adjustment, alleging that the application notes to the theft guideline provide that theft " '[f]rom the person of another' refers to property, *taken without the use of force* that was being held by another person or was within arms' reach. Examples include pick-pocketing or non-forcible purse-snatching, such as the theft of a purse from a shopping cart." Guideline § 2B1.1, comment (n. 7) (emphasis added). Because White, with threat of force, took the automobile from his first kidnap victim, as a result of his wielding of the knife, he argues that the theft from the person adjustment cannot properly be applied in this factual scenario.

The government properly notes the fundamental difficulty with White's argument. This difficulty is with the district court's decision to apply the improper theft guideline (§ 2B1.1), normally applicable to non-violent takings of property from the person of another, rather than the robbery guideline (§ 2B3.1), that more properly applies to cases involving the threat of force or other types of violent conduct.[4] Obviously the reason application note 7 to Section 2B1.1 of the Guidelines considers only non-violent takings from the person of another is because the authors of the note believed that a violent assault or threat of assault in the taking from the person of another would be treated under a separate, distinct and more proper guideline (the robbery guideline). As the background note to the theft guideline states:

"Theft from the person of another, such as pick-pocketing or non-forcible purse snatching receives an enhanced sentence

---

**3.** This guideline was in all probability utilized since Appendix A to the Sentencing Guidelines provides that the theft guideline is one of the two guidelines that will ordinarily apply to sentencing for the offense of transporting a motor vehicle across state lines in violation of 18 U.S.C. § 2312. (The other normally applicable guideline is § 2B1.2 pertaining to receiving stolen property).

**4.** "[T]hefts from the person by means of force or fear ... are robberies." Sentencing Guidelines § 2B1.1, comment. (backg'd.).

because of the increased risk of physical injury. This guideline does not include an enhancement for thefts from the person by means of force or fear; such crimes are robberies."

Sentencing Guidelines § 2B1.1, comment. (backg'd.).

Although we are of the opinion that the district court improperly applied the theft guideline rather than the robbery guideline, we are of the belief that this error, under the circumstances of this case, was a mere technicality; thus, it is unnecessary to remand this case for resentencing. Section 3D1.2(a) of the Sentencing Guidelines mandates that the interstate transportation of a motor vehicle count, to which the district court applied the theft guidelines, be grouped for sentencing with the count involving the kidnapping of the Washington University employee.[5] Section 3D1.3(a) then provides that a single offense level be assigned to the Group that is to be determined based upon "the most serious of the counts comprised in the Group, i.e., the highest offense level of the counts in the Group." Sentencing Guidelines § 3D1.3(a). When section 3D1.3(a) is applied to White's case, it is apparent that the kidnapping count involving the Washington University employee has a higher offense level than the interstate transportation of a motor vehicle count whether the district court had applied the theft guideline with the adjustment for theft from the person (as it did), the theft guideline without the adjustment for theft from the person (as White desires) or the robbery guideline (as was proper). In all of these cases, this means that section 3D1.3(a) would require that the offense level for the kidnapping count rather than the transportation of a motor vehicle count determine the Group's offense level. The offense level applicable to the interstate transportation of a motor vehicle count, thus, had no effect upon White's

sentence because White's sentence for this count was determined by the offense level applicable to the kidnapping count. Because the district court did not consider the offense level applicable to the transportation of a motor vehicle count in sentencing White, the theft from the person adjustment to the offense level for this count also had no relevance to White's term of confinement. Thus, any possible error in the district court's application of the theft from the person adjustment to the interstate transportation of a motor vehicle count was harmless beyond a reasonable doubt and we need not determine whether the application of the theft from the person adjustment was erroneous in order for White's sentence to be upheld.

Because the district court properly applied the Guidelines to facts free from clear error, we hold that White's sentence is

Affirmed.

---

5. Section 3D1.2(a) reads as follows:
  "All counts involving substantially the same harm shall be grouped together into a single Group. A count for which the statute mandates imposition of a consecutive sentence is excluded from such Groups for purposes of §§ 3D1.2–3D1.5. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction."
Because the kidnapping of the Washington University employee and the interstate transportation of her motor vehicle involved the same victim and the same transaction, they clearly were properly grouped together under this section.