**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Dwight P. CHANDLER, Defendant– Appellant.**

No. 92–4017.

United States Court of Appeals, Seventh Circuit.

Argued May 3, 1993.

Decided Jan. 3, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 1, 1994.

Robert T. Coleman (argued), Kit R. Morrissey, Asst. U.S. Attys., Crim. Div., Fairview Heights, IL, for plaintiff-appellee.

Renee E. Schooley, Federal Public Defender, Andrea L. Smith (argued), Office of the Fed. Public Defender, East St. Louis, IL, for defendant-appellant.

Before POSNER, Chief Judge, COFFEY, Circuit Judge, and WILLIAMS, District Judge.*

COFFEY, Circuit Judge.

A jury convicted Dwight Chandler of two counts of distributing crack cocaine and one count of possessing with intent to distribute crack cocaine, all in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Chandler to concurrent terms of ninety-seven months' imprisonment, to be followed by four years of supervised release. In this appeal Chandler challenges the lawfulness of the prosecutor's use of a peremptory challenge to strike a black man from the venire, the sufficiency of the evidence supporting his conviction, and the district court's computation of his sentence. We affirm Chandler's conviction and sentence.

## I. BACKGROUND

In January of 1992 an officer of the O'Fallon, Illinois police department stopped Chandler for a traffic violation. The officer arrested Chandler upon finding a set of stolen license plates in the back seat of the car and some crack cocaine lying on the street just outside the car. Crack cocaine was also found hidden in Chandler's boots. Chandler agreed to pay his debt to society by working undercover for the local police department. His duties were to arrange and make purchases of cocaine while the police observed and recorded the transactions. Chandler's first assignment was to purchase cocaine from a drug dealer in East St. Louis, Illinois named Julius Jackson. Police provided Chandler with a recording device and money to be used in making the purchase. The transaction went off without a hitch. Chandler subsequently arranged a second transaction with Jackson that resulted in the recov-

---

* The Honorable Spencer M. Williams, of the United States District Court for the Northern District of California, is sitting by designation.

ery of one-quarter kilogram of cocaine and Jackson's arrest.

Following Jackson's arrest, Chandler kept in contact with police but claimed he was unable to set up another transaction like the one with Jackson. A month or so after Jackson's arrest, a confidential informant told Detective Harper of the Belleville, Illinois police department that Chandler was selling crack cocaine in the Belleville area. Harper had the informant arrange a meeting with Chandler. During this meeting, Chandler sold Harper three grams of crack cocaine and gave Harper his telephone number. About one month later, Harper used this number to contact Chandler and arrange another drug buy. This time, however, Harper arranged for fellow police officers to move in and arrest Chandler if the transaction took place.

Chandler and Elvis Miller, a passenger in his car, met Harper as planned in the parking lot of a restaurant in Belleville. Harper gave Chandler $250 in exchange for 2.8 grams of crack cocaine. Using a prearranged signal, Harper alerted the arresting police units that the purchase had been consummated. As Chandler pulled his car out of the lot, a patrolman activated his red lights and siren and pulled behind him. Chandler slowed his car as if to stop, and then sped away. The patrolman, Detective Harper, and the others followed in hot pursuit. Chandler veered into an alley behind a service station, which turned out to be a dead end. As a result, Chandler was forced to turn back to the front of the station and, as he did, the rear panel of his car collided with the front fender of Harper's vehicle. Chandler kept on going; the police followed and forced Chandler to pull over on a nearby street. The entire chase lasted about five minutes. Chandler and Miller were arrested and, during the search of Chandler's car, a pistol, two vials of cocaine, and the $250 that Harper had given Chandler were recovered.

Chandler was charged by indictment with two counts of distributing crack cocaine and one count of possessing with intent to distribute crack cocaine, all in violation of 21 U.S.C. § 841(a)(1), and one count of carrying a firearm during a drug-trafficking offense in violation of 18 U.S.C. § 924(c). A jury trial followed. During voir dire, the government used a peremptory challenge to strike a black man from the venire. Chandler was ultimately found guilty of the distribution and possession counts and was acquitted of the firearm count by a twelve-member jury that included two black jurors.

The district court computed Chandler's sentence under the United States Sentencing Guidelines. Chandler's criminal history category was I. The base offense level of 26 was increased by two points pursuant to Guidelines § 3C1.2 because the court found that Chandler had recklessly endangered the life of another person in the course of fleeing from the Belleville, Illinois police, and by an additional two points pursuant to Guidelines § 2D1.1(b)(1) because the court found that Chandler simultaneously possessed the pistol that was found in his car and distributed crack cocaine. The court declined to decrease the offense level by two points pursuant to Guidelines § 3E1.1 because it found that Chandler had not accepted responsibility for his offenses. All of this resulted in a sentence of ninety-seven months in prison to be followed by four years of supervised release.

## II. DISCUSSION

### A. Batson *Claim*

Chandler, who is black, argues that he was deprived of equal protection of the laws when the prosecutor used his peremptory challenge to exclude the black venireman from the petit jury. The Equal Protection Clause of the Fourteenth Amendment prohibits the exercise of peremptory challenges to exclude venirepersons from the petit jury on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S.Ct. 1712, 1716, 90 L.Ed.2d 69 (1986). This prohibition extends to the federal government through the Due Process Clause of the Fifth Amendment. *United States v. Williams*, 934 F.2d 847, 849 n. 1 (7th Cir.1991). In *Batson*, the Supreme Court set forth an evidentiary framework for assessing whether the exercise of a peremptory challenge violates the Equal Protection Clause. A defendant who suspects that a

prosecutor's peremptory challenge to a venireperson is motivated by racial discrimination must make a timely objection to the challenge, 476 U.S. at 99–100, 106 S.Ct. at 1724–25, and then a prima facie showing of purposeful, racial discrimination. *Id.* at 97, 106 S.Ct. at 1723. Once the defendant makes this prima facie showing, the burden shifts to the prosecutor to come forward with a neutral explanation for the peremptory challenge. *Id.* The trial court is then obligated to determine whether the defendant has established that the peremptory challenge was motivated by purposeful, racial discrimination. *Id.* at 98, 106 S.Ct. at 1723.

In this case, the following exchange took place in the district court: The prosecutor expressed her desire to use a peremptory challenge to strike one of the black venirepersons. Chandler's trial counsel asked the prosecutor to give a reason for the challenge. She gave five: (1) the venireman made eye contact with Chandler when asked whether he knew Chandler; (2) he rolled his eyes at some of the court's questions and at other times appeared inattentive; (3) he was young; (4) he was single; and (5) he resided in the same area as Chandler. Chandler's trial counsel responded that she had not seen the venireman make eye contact with Chandler (but conceded that she had not been watching) and noted that the venireman and Chandler were not from the same city (Chandler resided in Belleville, Illinois and the venireman in East St. Louis, Illinois, an adjoining city). There was no further discussion about the black venireman, and the court excused him.

■ Chandler contends that this exchange was sufficient to preserve a *Batson* claim for appellate review. We disagree. A timely, specific objection to the use of a peremptory challenge is requisite to a *Batson* claim. *Doe v. Burnham,* 6 F.3d 476, 481 (7th Cir.1993); *Thomas v. Moore,* 866 F.2d 803, 804 (5th Cir.), *cert. denied,* 493 U.S. 840, 110 S.Ct. 124, 107 L.Ed.2d 85 (1989); *see also Batson,* 476 U.S. at 99–100, 106 S.Ct. at 1724–25 (prosecutor's use of peremptory challenges evaluated following defendant's "timely objection"). Chandler's trial counsel failed to object to the prosecutor's use of her peremptory challenge. She merely requested that court require the prosecutor to explain why she sought to exclude the black venireman from the petit jury. Perhaps this request was grounded on a suspicion that the prosecutor's peremptory challenge was motivated by purposeful, racial discrimination. So far as we can tell it was not, for Chandler's trial counsel never made that claim in the trial court. We have continually insisted on clear and timely preservation of alleged error in the trial court. *See, e.g., United States v. Neely,* 980 F.2d 1074, 1084 (7th Cir.1992) (to preserve an issue for appeal, a timely, specific objection on the proper grounds must be made at trial); *United States v. Chaidez,* 919 F.2d 1193, 1202 (7th Cir.1990) (specific ground for an objection must be identified at trial); *United States v. Wynn,* 845 F.2d 1439, 1442 (7th Cir.1988) ("To preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection."). In the context of a *Batson* claim, this means that a defendant must specifically object to the peremptory challenge on the ground that it is motivated by purposeful, racial discrimination.

■ Contemporaneous objection is imperative with respect to *Batson* claims because the trial court frequently is in a position to rule on the objection, and in all probability to resolve such claims, as well as to create a record for appellate review. *See United States v. Pulgarin,* 955 F.2d 1, 2 (1st Cir. 1992); *Government of the Virgin Islands v. Forte,* 806 F.2d 73, 75–76 (3rd Cir.1986). Chandler's trial counsel failed to present to the trial court the issue whether the prosecutor's use of her peremptory challenge ran afoul of *Batson.* Granted, she mentioned her disagreement with two of the prosecutor's reasons for challenging the black venireman. But she did not alert the trial judge to her *Batson* claim; her belief that, notwithstanding the prosecutor's facially race-neutral explanation, the peremptory challenge was motivated by purposeful, racial discrimination. Only by pressing a claim of purposeful, racial discrimination—that is, by requesting trial court to rule on whether the defendant has

established purposeful, racial discrimination—does a defendant preserve a *Batson* claim for appellate review. *See Hernandez v. New York*, 500 U.S. 352, ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality) (once the trial court has ruled on the ultimate question of intentional discrimination, the defendant has raised *Batson* claim); *cf. Doe v. Burnham*, 6 F.3d at 481 (holding that the trial court had improperly set aside a peremptory challenge where the parties had not asked for a ruling on whether the challenge was racially motivated); *Soler v. Waite*, 989 F.2d 251, 253–54 (7th Cir.1993) (suggesting that trial counsel in a civil suit did not preserve a *Batson* claim for appeal by saying, "I like [the challenged venireperson]," in response to opposing counsel's race-neutral reason for using a peremptory challenge).

In this sense, a properly made objection to a peremptory challenge is analogous to a properly made objection to a proffered jury instruction. Say two lawyers, **A** and **B**, are participating in a jury instructions conference. **A** proposes "Pattern Jury Instruction 10." **B** (**A**'s adversary) asks **A** to explain why he wants the judge to read that instruction, and **A** gives a reason. **B**'s mere request for an explanation from **A** does not amount to an objection to the use of "Pattern Jury Instruction 10." To lodge an objection to the jury instruction, **B** must specifically request from the trial court a ruling on whether, in light of **A**'s proffered reason, the disputed instruction should be read to the jury.

Had Chandler's trial counsel properly objected to the prosecutor's use of her peremptory challenge, the trial court could have analyzed the prosecutor's explanation and ruled whether the prosecutor's reasons were legitimate or mere pretenses designed to mask purposeful, racial discrimination. Chandler's trial counsel failed to give the district court an opportunity to make such a ruling, as she did not inform the court that the prosecutor's explanation for the peremptory challenge did not, in her opinion, satisfy *Batson*.

██ The question thus becomes whether the trial court committed plain error by allowing the prosecutor to use a peremptory challenge to strike the black venireman. *See*

Fed.R.Crim.P. 52(b) (plain errors or defects affecting substantial rights may · be · notice although they were not brought to the attention of the trial court). The answer is given by *Hernandez v. New York*, 500 U.S. at ——, 111 S.Ct. at 1866: "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." The prosecutor's explanation why she used a peremptory challenge to strike black venireman is not inherently discriminatory: Certainly a prosecutor could permissibly exclude a venireman from the petit jury on any of the grounds proffered by the prosecutor in this case. The district court therefore did not commit plain error in allowing the prosecutor to exclude the black venireman from the petit jury.

### B. *Sufficiency of the Evidence*

██ Chandler also argues that the evidence adduced at his trial was insufficient to establish beyond a reasonable doubt that he intended to violate the law when he sold crack cocaine to Detective Harper on February 11, 1992, and on March 10, 1992, and when he possessed the crack cocaine that was recovered in his car on March 10. Chandler concedes that he possessed and distributed the crack cocaine but submits that he engaged in these activities only to help the police snare drug dealers. A defendant challenging the sufficiency of the evidence supporting his conviction shoulders a heavy burden. *United States v. Holland*, 992 F.2d 687, 689 (7th Cir.1993). We will uphold the conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

This need not detain us long. We agree with the jury's rational finding that Chandler intended to commit criminal offenses on both the 11th of February and the 10th of March, 1992. Chandler's contention that he believed he was working for the police when he sold the cocaine to Detective Harper strains credulity. Chandler was well aware that when he was working for the police, he was re-

quired to follow certain rules: He could not sell cocaine, commit crimes, or carry a weapon. Yet Chandler was guilty of violating all three of those rules on February 11 and March 10. Moreover, Chandler should have known from his experience working with the police during their investigation of Julius Jackson that he did not have a license to sell drugs. The police supervised and monitored Chandler's purchase of cocaine from Jackson. For example, police officers recorded and monitored telephone calls that Chandler placed to Jackson and equipped Chandler with a body recording device before he went to Jackson's residence to purchase the cocaine. The police gave him a specific amount of money with which to make the purchase and searched him immediately before and immediately after his meeting with Jackson. Although in arranging the drug deal Chandler had conversations with Jackson that were not monitored by the police, Chandler notified the police of the impending deal so that they could monitor and record the actual transfer of money for cocaine. By contrast, Chandler never notified the police where and when he was going to sell cocaine. Given the close supervision by police officers over his purchase of the cocaine from Jackson, and the *absence* of supervision over his activities on February 11 and March 10, Chandler obviously knew that his sale of cocaine on those two occasions was unlawful.

Chandler submits that he had to sell crack cocaine to make contacts with drug dealers so that he could report them to the police. Had he stopped selling drugs, he argues, these drug dealers would start getting suspicious, and he would not have been able to gain and retain their confidence and reel them in for the police. Nevertheless, the police had information that the only thing Chandler was reeling in was money for himself: The impetus for Harper to arrange the February 11 meeting with Chandler was a report from a confidential informant that Chandler had "gone bad." This information

was corroborated by Chandler's failure to inform the police where and when he was selling cocaine, and by his flight from the police after his sale of crack cocaine to Detective Harper on March 10. We affirm Chandler's conviction for distributing and possessing with intent to distribute crack cocaine.

## C. *Sentencing Issues*

Finally, Chandler challenges the district court's computation of his sentence. He initially argues that the district court erroneously enhanced the offense level of his sentence by two levels pursuant to § 3C1.2 of the Sentencing Guidelines for recklessly endangering the life of another person during his flight from the police after the March 10 drug sale.[1] The court's determination that Chandler recklessly endangered the life of another person is a finding of fact that we review for clear error. 18 U.S.C. § 3742(e); *see United States v. Hagan,* 913 F.2d 1278, 1282–83 (7th Cir.1990) (enhancement pursuant to pre–1990 version of Guidelines § 3C1.1 for obstruction of justice caused by fleeing from arrest). The court's finding is not clearly erroneous. Application note one to Guidelines § 2A1.4, defines "reckless" as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." Chandler led the police on a chase, at dusk, along a two-lane highway that runs through a series of residential subdivisions in Belleville. He traveled at speeds that ranged from thirty-five to fifty miles per hour while swerving from lane to lane to prevent the police from going around him. A reasonable person would exercise a higher standard of care than Chandler did. As the court noted, Chandler's escapade through the neighborhoods might very well have resulted in injury to unsuspecting residents who hap-

1. Guidelines § 3C1.2 provides:

If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels.

Prior to November 1, 1990, Guidelines § 3C1.1, applied to avoiding or fleeing from arrest. The application notes to subsequent versions of § 3C1.1 provide that avoiding or fleeing from arrest is conduct to which Guidelines § 3C1.1 was not intended to apply.

pened to be in the vicinity of the road as Chandler sped by, to the police officers who were pursuing Chandler, and to the passenger in Chandler's car.

Chandler argues that by assessing the two-point enhancement in this case, the district court impermissibly equated reckless endangerment with flight from arrest so that any time a suspect flees to avoid arrest, his sentence is to be enhanced. Chandler misconstrues the district court's findings. The court found that Chandler did more than simply flee; it found that he resisted arrest by leading law enforcement officers on a wild chase and, in the process, endangered the lives of other people, including the pursuing officers. *Cf. United States v. White,* 903 F.2d 457, 462–63 (7th Cir.1990) (stating that two-point enhancement pursuant to pre–1990 Guidelines version of § 3C1.1 for obstruction of justice "where facts demonstrate clear physical endangerment of others whether it be law enforcement personnel and/or innocent bystanders"). Chandlers' conduct falls squarely within the scope of § 3C1.2. *See* U.S.S.G. § 3C1.2 comment. n. 1 (Nov. 1991) (two-point adjustment is applicable where the defendant engaged in dangerous conduct in the course of resisting arrest); *United States v. Frazier,* 981 F.2d 92, 96 (3d Cir.1992) (sufficient factual basis for finding of reckless endangerment where the defendant led law enforcement officers on high-speed chase, swerved around officers' cars that were attempting to block him, and struck one of the cars while an officer was driving it). We affirm the district court's application of Guidelines § 3C1.2 to enhance Chandler's sentence.

■ Chandler also contends that the district court erroneously enhanced his sentence pursuant to Guidelines § 2D1.1(b)(1), for possessing a firearm (the pistol that was found in his car) in relation to a drug-trafficking offense.[2] The jury acquitted Chandler of using the pistol in relation to a drug-trafficking offense in violation of 18 U.S.C. § 924(c). Chandler concedes that it is the law of this and other circuits that a sentencing court can

enhance a defendant's sentence pursuant to Guidelines § 2D1.1(b)(1) for possessing a firearm although the defendant has been acquitted of criminally using it if the court finds that the defendant's possession of the firearm is related to the drug-trafficking offense. *United States v. Welch,* 945 F.2d 1378, 1385 (7th Cir.1991); *United States v. Romulus,* 949 F.2d 713, 716–17 (4th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1690, 118 L.Ed.2d 403 (1992); *United States v. Coleman,* 947 F.2d 1424, 1428–29 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992); *United States v. Duncan,* 918 F.2d 647, 652 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991). He urges us to reconsider this position on the ground that it is fundamentally unfair. Chandler ignores the fact that the jury applies the evidence that it receives at trial against the "beyond a reasonable doubt" standard for burden of proof whereas the sentencing court applies the evidence that it receives against the significantly less-stringent "preponderance of the evidence" burden of proof. *See Welch,* 945 F.2d at 1385. That the government could not prove beyond a reasonable doubt that Chandler used the pistol in relation to a drug-trafficking crime does not necessarily mean Chandler did not possess the pistol in relation to the crime. Chandler also ignores the Sentencing Commission's rejection of a pure "charge offense" system of punishment in favor of something closer to a "real offense" system of punishment. *See* U.S.S.G. Ch. 1, Pt. A, policy statement 4(a) (Nov. 1992). The system adopted by the Sentencing Commission (and clarified in the latest version of the Guidelines, *see* U.S.S.G. § 1B1.3. comment. n. 1 (Nov. 1993)) directs the sentencing court to punish a defendant for engaging in certain types of conduct, including possessing a firearm during the commission of a drug-related crime, even if no criminal charges were brought against the defendant for engaging in such conduct. *Id.* We therefore decline Chandler's invitation to reconsider our position that a sentencing court can enhance a

---

**2.** Guidelines § 2D1.1(b)(1) provides: "If a dangerous weapon (including a firearm) was possessed [during the commission of a drug-related offense], increase [the defendant's base offense score] by 2 levels."

defendant's sentence upon finding that the defendant possessed a dangerous weapon in relation to a drug-trafficking crime, even though a jury has acquitted the defendant of criminally using the weapon.

■ We now must determine whether the district court's decision to enhance Chandler's sentence was clearly erroneous. It wasn't. Application note three to Guidelines § 2D1.1(b)(1), states: "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." The government established, by a preponderance of the evidence, that the pistol they discovered in Chandler's car was connected with Chandler's sale and possession of crack cocaine. Guns are tools of the drug dealers' trade, and so it is not unusual for police to find a gun at or near the scene of a drug deal. *See United States v. Rush*, 890 F.2d 45, 49 (7th Cir.1989). The police found the pistol on the front seat of Chandler's car shortly after Chandler sold $250 worth of crack cocaine to Detective Harper, and an additional $500 worth of crack was found on Chandler's person. Chandler asserts that he did not own the pistol and was not aware of its presence in the car. The evidence contradicts these assertions. When he was arrested, Chandler was wearing an empty shoulder holster. It is reasonable to assume that he was wearing the holster to carry the pistol. Moreover, Elvis Miller, Chandler's passenger during the drug sale and ensuing chase, testified that during the chase Chandler removed the pistol from the shoulder holster and tried to hand it to him. We affirm the district court's application of § 2D1.1(b)(1) to enhance Chandler's sentence.

■ Finally, Chandler contends that the district court should have reduced his sentence because he accepted responsibility for his offenses. The district court is in a better position than an appellate court to accurately evaluate a defendant's acceptance of responsibility. *United States v. Pitz*, 2 F.3d 723, 732 (7th Cir.1993). We therefore review the court's refusal to reduce Chan-

dler's sentence for clear error. *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir.1993). Guidelines § 3E1.1(a) provides for a two-level reduction in a defendant's base offense score "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Accompanying commentary explains: "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilty and expresses remorse." U.S.S.G. § 3E1.1, comment. n. 2. (Nov. 1992). Chandler argues persuasively that he is not barred from receiving the downward adjustment to his sentence just because he went to trial and was convicted of three of the four charges brought against him. "Conviction by trial . . . does not automatically preclude a defendant from consideration for [a reduction for acceptance of responsibility]. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.* But the district court found that this case did not present the "rare situation" described in the commentary to § 3E1.1 because even after trial Chandler "persist[ed] in his complete absolute denial of every facet of the charges against him." Transcript of Sentencing Hearing, at 30 (Nov. 23, 1992). This finding is not clearly erroneous. Chandler did not challenge the constitutionality of a statute, nor did he claim that the statutes he was charged with violated did not apply to his conduct. He claimed he was not guilty of the charged offenses because he was working for the police when he committed the offenses. Hence he did not "fess up" to the conduct underlying his conviction, *see United States v. Escobar–Mejia*, 915 F.2d 1152, 1153 (7th Cir.1990), but instead blamed his conduct on the police. According to Chandler, the pressure the police put on him to snare drug dealers caused him to sell drugs.

Chandler asserts that like the defendants in *United States v. Big Crow*, 898 F.2d 1326

(8th Cir.1990), and *United States v. Fleener*, 900 F.2d 914 (6th Cir.1990), he only contested his intent to violate the law and, therefore, like the defendants in those cases, should have received a reduced sentence for accepting responsibility. This case is quite different from *Big Crow* and *Fleener*. In *Big Crow*, the defendant acknowledged that his behavior was wrong and that he was responsible for the consequences of his behavior, but he went to trial to question whether someone acting in a drunken stupor could, as a matter of law, intentionally assault someone. 898 F.2d at 1330. In *Fleener*, the defendant's reduction was premised on pretrial statements and conduct that assisted law enforcement officers. 900 F.2d at 913. Here, Chandler did not assist the police. On the contrary, he fled from the police and led them on a wild chase that resulted in an accident. Once Chandler was arrested, he denied possessing the pistol found in his car. Only after he had gotten himself into trouble did he offer to assist the police by giving them information about the illicit activities of other drug dealers, *compare Tolson*, 988 F.2d at 1499 (pleading guilty only after becoming aware that government has a strong case is inconsistent with acceptance of responsibility), and not even about his own misconduct. Guidelines § 3E1.1(b)(1) provides that a defendant may be entitled to a reduction in his sentence for accepting responsibility if he provides the government with information concerning *his own* involvement in the offense. Moreover, unlike the defendant in *Big Crow*, Chandler did not acknowledge that his behavior was wrong or accept responsibility for the consequences of his behavior. He conceded that the statutes he was charged with violating applied to his conduct, but blamed his conduct on the police. We affirm the district court's finding that Chandler failed to accept responsibility for his offenses.

### III. CONCLUSION

Chandler's conviction and sentence are AFFIRMED.