**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bernard WATSON, Defendant–
Appellant.**

**No. 97–3779.**

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1999.

Decided Aug. 19, 1999.

Steven Chanenson (argued), Office of the United States Atty., Chicago, IL, for Plaintiff–Appellee.

Michael B. Cohen (argued), Chicago, IL, for Defendant–Appellant.

Before BAUER, FLAUM, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Bernard Watson was convicted of interference with commerce by threats or violence, and use of a firearm in furtherance of a crime of violence after he robbed a Federal Armored Express Truck. He now appeals, arguing that: (1) his confession should have been suppressed; (2) he was deprived of a fair trial by the prosecutor's improper conduct; (3) he should not have been held accountable for the loss of cigarette tax stamps which could easily be replaced; and (4) his sentence should not have been enhanced for reckless endangerment. Because we reject each of these arguments, we affirm.

## I. BACKGROUND

This case is before us for the second time. The first time, we held that Judge Brian Barnett Duff had "denied the government a fair suppression hearing" and remanded the case for a new hearing. *See United States v. Watson*, 87 F.3d 927, 928 (7th Cir.1996) ("*Watson I*"). On remand, the case was transferred to Judge Ann Williams, who conducted a new suppression hearing and granted Watson's motion to suppress his confession. However, on reconsideration, Judge Williams vacated her earlier order and found that the confession was admissible.

The facts underlying the suppression controversy, as well as the rest of this appeal, are as follows. On September 8, 1992, Watson, along with Randy Ball, Carl Dixon, and Clarence Carter, robbed a Federal Armored Express Truck near the corner of Flournoy and Cicero in Chicago. During the course of the robbery, Watson hit a security guard on the head with a bottle of orange juice to subdue him. After the robbery, the thieves set fire to all the checks and cigarette tax stamps that they had recovered from the truck. The remaining loot was divided among the robbers.

Early in the morning on September 16, 1993, FBI Special Agent Ronald Hosko and Chicago Police Detective Robert Branum went to Watson's house to question him about the robbery. The agents then took Watson to a local police station where they continued to question him. After about an hour and a half, the agents drove Watson to the scene of the crime where they questioned him some more. Watson claims that he asked for an attorney in the car on the way to the crime scene. Finally, the agents took Watson to the Dirksen Federal Building, where he ultimately signed a waiver of rights, a written confession, and a cooperation agreement, although he does not recall signing the cooperation agreement.

The parties disagree about when Watson was given his Miranda rights, but they agree that it was not until they reached the Federal Building, four hours after Hosko and Branum began questioning Watson. Hosko claims that he advised Watson of his Miranda rights before Watson signed the waiver of rights. He recounts that once the waiver was signed, he and Watson prepared a written confession memorializing everything that Watson had told him. He says that he reviewed the statement with Watson before Watson signed it. Hosko and Assistant U.S. Attorney Krulewitch then prepared a cooperation agreement, which they also reviewed with Watson. The agreement stated that Watson acknowledged that he was not seeking the assistance of counsel. Watson signed the agreement.

For his part, Watson claims that he was not Mirandized until after he signed the waiver and confession. He also claims that he did not provide the police with the information that was contained in the confession, and that he only signed the confession because the police told him that he would be allowed to go home if he did. Finally, Watson claims that Hosko told him that he would be arrested if he got an attorney.

Several days after Watson signed the confession, a warrant was issued for his arrest. When Hosko and Branum attempted to arrest Watson, he drove straight at them, forcing them to jump out of the way in order to avoid being run over. Watson then led police on a high speed chase through a residential neighborhood, speeding through stop signs and red lights and driving the wrong way on a one way street. The police ultimately abandoned the chase because of the danger it posed to the public. Shortly thereafter, Watson came to the Federal Building with his lawyer and surrendered.

Watson proceeded to trial before a jury beginning on April 2, 1997. The government was represented by Assistant U.S. Attorneys Saltoun and Guentert. Krulewitch testified for the government about the circumstances in which Watson signed the cooperation agreement. On April 8, the jury found Watson guilty of interference with commerce by threats or violence, in violation of 18 U.S.C. § 1951, and use of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). However, the jury acquitted Watson of assaulting a federal officer, in violation of 18 U.S.C. § 111.

The PSR prepared for Watson's case recommended sentence enhancements for: (1) an amount of loss in excess of $250,000, U.S.S.G. § 2B3.1(b)(7)(D);[1] (2) reckless endangerment during flight, U.S.S.G. § 3C1.2; and (3) obstruction of justice, U.S.S.G. § 3C1.1. Watson filed objections to the PSR, and the government filed a

response signed by Krulewitch. Watson filed a motion to strike the government's response on the grounds that it was improper for Krulewitch to be involved in the case after he had testified as a witness at trial. The district court denied the motion to strike.

In a written opinion dated August 7, 1997, the district court found that the amount of loss attributable to the robbery exceeded $250,000, and that the reckless endangerment enhancement was warranted. However, the court declined to apply the obstruction of justice enhancement, finding that it was unclear whether Watson's false statements during the suppression hearings had been made with a willful intent to obstruct justice. On August 11, the government filed a motion, again signed by Krulewitch, in which it pointed out that the court had only considered Watson's statements concerning suppression matters and had not considered Watson's perjurious testimony at trial that he had not committed the robbery. Again, Watson objected to Krulewitch's continued involvement in the case. Krulewitch voluntarily agreed to stop handling the case.

On October 6, 1997, the court issued an opinion and order in which it reconsidered its prior ruling regarding the obstruction of justice enhancement and held that the enhancement was applicable. The court also reexamined the amount of loss and reckless endangerment enhancements, but concluded that both enhancements were warranted. Finally, the court denied Watson's motion to remove Krulewitch from the case, noting that Krulewitch had not been the trial attorney and that he had been replaced by Guentert at sentencing. On October 29, 1997, the lower court sentenced Watson to 181 months of imprisonment. This appeal followed.

## II. Discussion

### A. Suppression of Confession

 On reconsideration of Watson's motion to suppress, Judge Williams found

---

1. The amount of loss enhancement was previously codified at U.S.S.G. § 2B3.1(b)(6).

that Watson was not credible and that he had not asked for a lawyer prior to signing the cooperation agreement. Therefore, she held that Watson's Fifth Amendment rights had not been violated and that his confession was admissible. Watson challenges this holding solely on the grounds that it was improper for Judge Williams to make a new determination about his credibility when Judge Duff had already found that he was credible. Citing this Court's decision reversing Judge Duff's suppression order, Watson claims that we remanded his case solely to allow the government to introduce his statements as impeachment evidence at the suppression hearing, and that we directed Judge Williams to treat Judge Duff's credibility determinations as the law of the case. The scope of the remand is a question of law that we review *de novo*.

At the outset, we note that our task is made all the more difficult by the fact that Watson has not indicated which part of our previous opinion directed that "the decision by Judge Duff as to the credibility of the witnesses would not be disturbed." (Watson Brief, 20.) As far as we can tell, Watson has latched onto our statement that the government's appeal was "not a challenge to the district court's credibility findings." *Watson I*, 87 F.3d at 928. However, this statement was part of a larger passage that stated:

> Initially, we need to clarify what is not at issue in this appeal. This is not a challenge to the district court's credibility findings. Instead, the government argues *at a more fundamental level*, that the district court's evidentiary rulings denied the government a fair hearing.

*Id.* at 928 (emphasis added). Our purpose in making this statement was to emphasize that the question before us was not whether Judge Duff's credibility determination was sound given the information before him, but rather whether he had considered all the information that he should have when he made his credibility determina-

tion. Therefore, we in no way intended to prohibit Judge Williams from making new credibility determinations on remand.

In fact, the opinion makes clear that Judge Williams would have been remiss if she had not reconsidered Judge Duff's credibility determinations in light of the new evidence that was presented at the suppression hearing on remand. As we explained in *Watson I*, Judge Duff's refusal to allow the government to cross-examine Watson using the substance of his confession prevented the government from using a "quintessential prior inconsistent statement" to impeach Watson. *Id.* at 931. Accordingly, we reversed Judge Duff's suppression order and remanded "for a new suppression hearing consistent with [our] opinion." *Id.* at 932. The new suppression hearing would have been a purely academic exercise if Judge Williams had not been allowed to make new credibility determinations in light of the government's impeachment of Watson. For these reasons, we hold that Judge Williams did not exceed the scope of the remand. *See United States v. Parker*, 101 F.3d 527, 528 (7th Cir.1996) ("[T]he scope of the remand is determined ... by inference from the opinion as a whole.").

**B. Conduct of Krulewitch**

 Watson also claims that Krulewitch's improper conduct deprived him of a fair trial. In particular, he accuses Krulewitch of vindictive prosecution, and violation of the advocate-witness rule. These arguments take up a total of a page and a half in Watson's brief, and are supported by a single citation. We find that Watson has not adequately developed or supported his arguments and that they are waived. *See United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir.1993) ("Undeveloped and unsupported claims are waived."). In fact, the lack of development and support speaks to the paucity of the argument.

**C. Amount of Loss**

Watson next challenges the district court's finding that the amount of loss was

in excess of $250,000. U.S.S.G. § 2B3.1(b)(7)(D). He argues that the cigarette tax stamps were easily replaceable and should not have been included in the loss calculation.[2] He, therefore, contends that the amount of loss was only $214,900, and that his sentence should have been increased by two levels, not three. We review the district court's interpretation of the Sentencing Guidelines *de novo*, and its calculation of loss for clear error.

■ According to the Sentencing Guideline Application Notes, "when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to .the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim." *See* U.S.S.G. § 2B3.1, Application Note 3; U.S.S.G. § 2B1.1, Application Note 2. Watson does not argue that the market value of the cigarette tax stamps was difficult to ascertain, and we can think of no reason why it would be. (He certainly doesn't argue that he should have been held accountable for a bigger loss because the market value was inadequate to measure the harm to the victim.) Therefore, the appropriate measure of loss according to the Application Notes was the fair market value of the stamps, not their replacement cost. *See* U.S.S.G. § 2B1.1, Application Note 2 ("In the case of a theft of a check or money order, the loss is the loss that would have occurred if the check or money order had been cashed."); *United States v. Jenkins*, 901 F.2d 1075, 1084

(11th Cir.1990) ("The fact that the stolen stock certificates may be canceled and new certificates may be issued in their place does not change the value of the items stolen for sentencing purposes any more than recovery of a stolen car changes its value for sentencing purposes.").[3]

Federal Armored Express' insurance carrier suffered a loss of $492,316.24 as a result of the robbery. Based on this information, the court concluded that the amount of loss was at least $250,000. This was not error.

### D. Reckless Endangerment Enhancement

■ The district court enhanced Watson's sentence by two levels for reckless endangerment during flight pursuant to U.S.S.G. § 3C1.1. This enhancement is mandated when a "defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.1. The court based the enhancement on the fact that Watson led police on a high speed chase through a residential area. We review for clear error.

Watson argues that since he was acquitted of the assault charge, it was improper for the district court to punish him for the conduct underlying the charge by enhancing his sentence for reckless endangerment. This argument misses the mark. First of all, the assault charge and the reckless endangerment enhancement were not substantively equivalent. In order to establish that Watson violated 18 U.S.C.

---

**2.** At times, Watson also argues that the checks were easily replaceable and should not have been included in the loss calculation. Our analysis and holding with respect to the stamps apply equally to the checks.

**3.** In support of his contention that replacement cost was the correct measure of loss, Watson cites a number of fraudulent loan application and contract procurement cases. These cases are inapposite because there are special rules for calculating losses attributable to fraudulent loan applications and contract

bids. *See* U.S.S.G. § 2F1.1, Application Note 8(b) ("In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.").

§ 111, the government was required to show that he (1) forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered, (2) with a person designated in § 1114 (officers and employees of the United States), (3) while that person was engaged in, or on account of, the performance of official duties. 18 U.S.C. § 111. To establish that Watson's sentence should be enhanced for reckless endangerment, the government had to show that Watson (1) recklessly, (2) created a substantial risk of death or serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer. U.S.S.G. § 3C1.1. Thus, acquittal of the assault charge did not show that the endangerment enhancement was inappropriate.

 Second of all, the standard of proof for the assault charge was guilt beyond a reasonable doubt, while the standard of proof for the sentence enhancement was preponderance of the evidence. Thus, even if the jury had found that Watson was not guilty of reckless endangerment beyond a reasonable doubt (as Watson disingenuously claims), the sentencing court could have legitimately found reckless endangerment by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 155–56, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). Watson's argument that such a result would punish him for conduct of which he was acquitted is misguided. As the Supreme Court explained in *Watts*, "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction." *Id.* at 154, 117 S.Ct. 633. For this reason, a sentencing court may consider conduct of which a defendant has been acquitted as long as that conduct has been proven by a preponderance of the evidence. *Id.* at 157, 117 S.Ct. 633. The government met its burden when it established that Watson had led the police on a high speed chase through a residential neighborhood. *See e.g. United States v.*

*Giacometti*, 28 F.3d 698, 701 (7th Cir.1994) ("Giacometti's high speed chase and the ensuing danger to bystanders . . . is clearly the sort of reckless behavior covered by § 3C1.2."). Accordingly, it was not clearly erroneous for the district court to enhance Watson's sentence for reckless endangerment.

### CONCLUSION

For the foregoing reasons, Watson's conviction and sentence are AFFIRMED.