In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3326

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WILLIAM K. SMITH,

Defendant-Appellant.


Appeal from the United States District Court for the
Southern District of Illinois, East St. Louis Division.
No. 99 CR 30044--G. Patrick Murphy, Judge.


Argued January 20, 2000--Decided April 12, 2000


Before COFFEY, MANION and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  William K. Smith pled
guilty to charges of conspiring to manufacture
methamphetamine and assaulting a federal officer.
The district court sentenced him to 33 months on
each count, to be served concurrently. In
calculating this sentence, the district court
adjusted Smith's sentence two levels upward
pursuant to U.S.S.G. sec. 3C1.2, for reckless
endangerment during flight. On appeal, Smith
objects to this enhancement on two grounds.
First, he contends the government failed to meet
its burden in proving that he actually endangered
the officers' lives. Second, Smith faults the
district court for relying on personal, extra-
record knowledge instead of record evidence in
making its findings on this enhancement. We
vacate the sentence and remand.

I.

   One of the substances used in the manufacture
of methamphetamine is anhydrous ammonia, which is
also used in the farming industry as a
fertilizer. Anhydrous ammonia has a boiling point
of 28 degrees below zero, which means that to
store it in a liquid form, it must be kept at
extremely low temperatures or it must be stored
under pressure. On farms, it is typically stored
under pressure, and then injected into the soil

where it combines with the water in the soil to form a fertilizer. "Anhydrous" means "free from water" and this same quality which makes anhydrous ammonia useful in farming renders it very dangerous to people. When liquid anhydrous ammonia comes into contact with skin or eyes or when the vapor is inhaled, it can severely burn and damage tissues. In sufficient quantities and concentrations, it can cause death.

On the day of Smith's arrest, police officers had been alerted to a possible methamphetamine manufacturing operation, and were surveilling Smith and his co-conspirator Alfred Poppen. The officers observed Smith and Poppen stop off at an anhydrous ammonia storage tank at a local farm, where they apparently obtained some of the substance in a bucket. After driving a short distance, Poppen and Smith allegedly transferred the anhydrous ammonia into a thermos and continued on to Smith's home. At that time, officers attempted to stop the vehicle by activating their lights. Poppen and Smith continued driving, and began to head out of town. The two officers continued to follow the car driven by Poppen. During the pursuit, the officers saw Smith toss a thermos lid out the window. One officer observed Smith dumping anhydrous ammonia out of the thermos through the rolled down window of the car. The chase took place on a gravel road and the officers kept a distance of only five to ten feet between the vehicles because they did not want the road dust to obscure their vision of the activity in the car. One officer reported that the ammonia was in liquid form as it was being poured out the window but that it instantly vaporized, creating a cloud through which the officers then drove in the course of the pursuit. The officers closed the vents of their car and ensured that the windows were closed, and they were not actually injured by the ammonia dumping. Once the defendants' car stopped, Smith tried to run from the officers and attacked one of them as he was being captured, giving rise to the charge of assaulting a federal officer.

The district court enhanced Smith's offense level under section 3C1.2 of the Sentencing Guidelines, and Smith objected to the enhancement. In sentencing Smith, the court listened to argument from the government and from Smith regarding the dangerousness of anhydrous ammonia. The court considered two reports published by universities regarding the safe handling of anhydrous ammonia in the agricultural setting. Smith's counsel argued that there was no evidence of the quantity of the substance released, and no evidence of what quantity would be harmful under the circumstances in which it

was released, out in the open air during close pursuit. After hearing argument from Smith's counsel, the court asked whether counsel had ever worked on a farm. Smith's counsel replied that she had not, and the court ruled on Smith's objection:

All right. Thank you. The court understands the defendant's objection; but, the objection is overruled. There is--I'm satisfied that you get a nose full of anhydrous ammonia or a face full of it, it is dangerous. And I'm not trying to bring my own personal experience into this; but, I can't ignore the fact that growing up in the country I know what anhydrous ammonia is. And this is very dangerous. It just is.

Sentencing Tr. at 9. The court then adopted the probation officer's position that Smith's dumping of anhydrous ammonia created a risk of serious bodily injury. Smith appeals from the two-level increase on two grounds. First, he contends the government did not meet its burden of proving the dangerous nature of anhydrous ammonia in the quantity and concentrations that he released in the course of flight from the officers. Second, he contends that the district court improperly relied on extra-record knowledge in assessing the dangerousness of anhydrous ammonia, and the district judge should have recused himself when he became aware that he was unable to disregard his prior knowledge.

II.

We review the district court's enhancement for clear error. United States v. Watson, 189 F.3d 496, 501 (7th Cir. 1999); United States v. Chandler, 12 F.3d 1427, 1433 (7th Cir. 1994). The government has the burden of establishing by a preponderance of the evidence facts which justify an upward adjustment of the defendant's base offense level. Watson, 189 F.3d at 502. Section 3C1.2 provides:

If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels.

U.S.S.G. sec. 3C1.2./1 Smith argues that although anhydrous ammonia is a dangerous substance, there is no evidence in the record supporting a finding that he created a substantial risk of death or serious bodily injury in the quantity and concentration he released from the car during flight. A defendant recklessly creates a substantial risk when he is aware of the risk created by his conduct, and the risk was of such a nature and degree that to

disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise. Chandler, 12 F.3d at 1433. He also contends that the district judge relied on his own personal knowledge of the dangerousness of this substance rather than on any record evidence in reaching his conclusion. The government contends that we should look to the dangerousness of the act and not the consequences of the act in assessing whether Smith created a substantial risk of death or serious bodily injury. The government argues that it was merely fortuitous that the substance vaporized and did not harm the officers as they drove through the vapor cloud, and that the defendant should not benefit from this fortuitous outcome. The government further maintains that because Smith did not request that the district judge recuse himself, Smith waived any claim for recusal.

We begin by reviewing the record to determine if there is evidence supporting the finding that Smith's dumping of anhydrous ammonia created a substantial risk of death or serious bodily injury to the officers during the pursuit. The district court adopted the probation officer's position in rejecting Smith's challenge to the adjustment. The probation officer's Presentence Investigation Report ("PSR") recounts the officers' testimony that during the pursuit, Smith first tossed a thermos lid out the car window and then twice dumped anhydrous ammonia from the thermos. The PSR then concludes that "[b]ecause the defendant recklessly endangered law enforcement officials during flight by dumping anhydrous ammonia out of a window of a moving vehicle, a two level increase is warranted pursuant to sec. 3C1.2." In the calculations section of the report, the PSR repeats that "two levels are added for reckless endangerment during flight because the defendant dumped the anhydrous ammonia out of the car and endangered officers." The PSR contains no information about the quantity of anhydrous ammonia dumped, the quantity the thermos could hold, what concentration and duration of exposure to ammonia vapor is harmful, what concentration and duration of exposure the officers experienced during the chase, how fast the vehicles were traveling, the weather conditions that day and the effect of the temperature on the vaporizing of the substance, and what harm was likely given the circumstances of the dumping.

In objecting to the enhancement, Smith submitted two reports, culled from the Internet, regarding the safe handling of anhydrous ammonia in the farm setting. Much of the information in these reports addresses the special harms posed by the

storage of ammonia under pressure. Leaks in equipment or improper handling can result in blasts of the substance hitting the skin or eyes in liquid form, which can result in severe tissue damage. In some circumstances, vapors can damage the skin and eyes as well. Persons trapped in a confined space with vapors of anhydrous ammonia can seriously damage their lungs, and exposure to vapors of certain concentrations for certain durations can cause death. The reports are quite precise in detailing the potential harms of anhydrous ammonia vapor. Five parts per million may cause nose irritation after five minutes of exposure. Seven hundred parts per million causes coughing, and also causes eye irritation that can lead to partial or total loss of sight if not treated. Two thousand parts per million will burn and blister skin after only a few seconds of exposure, and five thousand parts per million will cause death by suffocation within minutes. The record thus contains substantial evidence that anhydrous ammonia is a dangerous substance, and that under certain conditions it can cause death or serious bodily injury.

What is missing here is what amount Smith dumped, what concentration of vapors the officers were exposed to, and for what length of time that exposure lasted. The government candidly admitted at oral argument that it did not produce evidence to the district court of the amount of ammonia the thermos could hold, or how much ammonia was in the thermos. Nor does the record indicate the weather, or the speed of the cars, or any way to calculate what concentration of vapors the officers experienced during the pursuit. Indeed the record does not reveal how it was physically possible for Smith to transfer first to a bucket and then to an ordinary thermos a substance that vaporizes at temperatures above 28 degrees below zero.

Contrary to the government's assertion that any dangerous act will suffice to meet the standard of section 3C1.2, the act must create a substantial risk of death or serious bodily harm. We know, for example, that fire is dangerous, that it can cause death or serious bodily harm. But if Smith had tossed a lighted match out the car window during the chase, no one would seriously argue that that action created substantial risk of death or serious bodily harm. Here, we do not know if Smith poured the equivalent of a lighted match out the window, or if he poured out an amount that would expose passengers in another car following closely behind to a substantial risk. The district court stated that if a person gets a "nose full" or a "face full" of anhydrous ammonia, the danger for serious harm exists. The question is whether

Smith released enough of the substance under the circumstances for that to occur. Because the government has not met its burden of proving by a preponderance of the evidence that Smith created a substantial risk of death or serious bodily harm to the officers, we vacate the sentence and remand for proceedings consistent with this order.

Smith also contends that the district court should have recused itself under 28 U.S.C. sec. 455. That section provides:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . .

However, Smith failed to properly appeal the court's refusal to recuse under section 455(a). "[T]he denial of a request that the judge recuse himself under section 455(a) must be appealed immediately by application for writ of mandamus, or it is waived." United States v. Horton, 98 F.3d 313, 316 (7th Cir. 1996); United States v. Balistrieri, 779 F.2d 1191, 1205 (7th Cir. 1985), cert. denied, 475 U.S. 1095 (1986). It is less clear under our case law whether we may review a refusal to recuse under section 455(b) when the argument is raised for the first time on appeal. Edgar v. K.L., 93 F.3d 256, 257 (7th Cir. 1996), cert. denied, 519 U.S. 1111 (1997) (delay in seeking disqualification can be fatal but passage of time is not conclusive if the justification for disqualification is compelling); Hook v. McDade, 89 F.3d 350, 353 n.2 (7th Cir. 1996), cert. denied, 519 U.S. 1071 (1997) (petition for writ of mandamus is the only recourse available to challenge a judge's denial of a motion for disqualification under section 455). Assuming for the sake of argument that we may appropriately review a section 455(b) claim raised for the first time on appeal, we will review for clear error when the claim is based on the judge's personal knowledge and the party moving for recusal is aware of the existence of the ground for recusal at the time the case is still before the trial court. See Baldwin Hardware Corp. v. Franksu Enterprise Corp., 78 F.3d 550, 557 (Fed. Cir. 1996), cert. denied, 519 U.S. 949 (1996); United States v. Bosch, 951 F.2d 1546, 1548 (9th Cir. 1991), cert. denied, 504 U.S. 989 (1992);

Osei-Afriyie v. Medical College of Pennsylvania, 937 F.2d 876, 886 (3rd Cir. 1991). Here, the district judge admitted that he "can't ignore the fact that growing up in the country I know what anhydrous ammonia is. And this is very dangerous. It just is." That appears to be an admission that the court may have ruled, at least in part, on the basis of personal knowledge. However, all of the evidence in the record is consistent with the district judge's personal belief, and Smith himself agrees that anhydrous ammonia is a dangerous substance. Thus, we fail to see how Smith was harmed by the court's reliance, if any, on personal knowledge of the dangers of this substance. In fact, the dangerousness of the substance was not a fact under dispute and arguably the rule does not apply at all. We do not think the judge clearly erred by not recusing sua sponte when he became aware that he had some extra-record knowledge regarding anhydrous ammonia. To hold otherwise would require the recusal of every judge who owns a hunting rifle, for example, when the issue of the dangerous nature of firearms is before the court. That is not the kind of personal knowledge of disputed facts that the rule was meant to protect against. On remand, we have no doubt that the court will make its fact findings on the basis of the evidence in the record before it.

VACATED AND REMANDED.

/1 The Application Notes to section 3C1.2 specify that "another person" includes any person other than a participant in the offense who willingly participated in the flight. Therefore, we do not consider whether Smith exposed his co-defendant Poppen to a substantial risk of death or serious bodily injury by pouring the anhydrous ammonia out the window.