In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3759

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VERN THOMAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 470-3—**William J. Hibbler**, *Judge.*

ARGUED APRIL 8, 2002—DECIDED JUNE 26, 2002

Before BAUER, EASTERBROOK and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Appellant Vern Thomas and three co-defendants, Edward Indihar, Salvatore DeLuca and Irvin Thomas (Appellant's brother, "Irvin") were indicted as co-conspirators and charged with various drug offenses. Thomas was charged with conspiracy to possess with intent to distribute cocaine, attempt to possess with intent to distribute cocaine, and possessing a firearm in furtherance of a drug trafficking crime. After a bench trial, the trial court found Thomas guilty on all three charges. Subsequently, however, the trial court vacated its finding of guilty on the possession of a firearm charge and instead, entered a finding of not guilty. Thomas was sentenced to

serve 102 months in prison. He appeals his conviction and sentence on several grounds, but for the following reasons, we affirm.

## BACKGROUND

In early spring of 2000, Edward Indihar contacted Roger Romano and expressed his interest in purchasing cocaine. Unbeknownst to Indihar, Romano was an undercover DEA Task Force Officer. On May 29, 2000, Indihar met Officer Romano at a restaurant in Norridge, Illinois to negotiate the details of the drug purchase. Romano informed Indihar that he had five kilograms of cocaine for sale at a certain price, and they discussed a time and place to consummate the deal. Outside the restaurant, Romano and another undercover agent showed Indihar the five kilograms of cocaine in the trunk of their vehicle. Afterwards, Indihar notified DeLuca and Thomas of his meeting with Romano and Thomas responded that he was eager to purchase the drugs.

Over the next several days, Indihar and DeLuca spoke with both Officer Romano and Thomas in an effort to put together a deal. On June 1, 2000, Indihar and DeLuca met with Romano again and agreed to purchase the five kilograms. Thomas agreed to pay $20,000 to Indihar for each kilo and Indihar planned to purchase the kilos from Romano at a lower price and share the difference with DeLuca. Thomas told DeLuca and Indihar that he had access to the money required to purchase all five kilos. The three agreed that they would make the purchase later that night at Chicago's Rock N' Roll McDonald's.

At this meeting, Indihar paged Romano, and when Romano called back, he spoke with Indihar, DeLuca and Thomas. During this call, Thomas confirmed to Romano that he wanted to buy the drugs that night; they then discussed, at length, the details of the transaction. Thomas told Romano that he and the others would meet Romano

at the McDonald's. Thomas also stated that if the transaction went smoothly, he would be interested in similar business in the future. Officer Romano taped this conversation.

That night, Thomas and his brother Irvin arrived at the McDonald's in a red Buick. Indihar and DeLuca arrived separately. Indihar called Romano to tell him that everyone had arrived, but shortly thereafter, DeLuca noticed several police vehicles in the area and they decided to change the meeting place to a nearby parking lot. At the new location, however, the transaction was again aborted because they observed police vehicles in the area.

On June 15, 2000, the parties arranged for another meeting at a restaurant. Again, Thomas and Irvin arrived together in the red Buick but remained in their car. Inside the restaurant, Romano found Indihar and DeLuca and requested to see the money. Indihar went outside and found Thomas in his Buick. Thomas showed Indihar the purchase money, which was in a brown paper bag on the front seat. Indihar asked Thomas to bring the money into the restaurant, but he refused and instead requested that Romano come outside to his Buick. Indihar told Thomas that Romano wanted to see the money inside, but Thomas responded that "it wasn't going to happen."

Indihar had several more conversations with both Romano and Thomas as to whether the purchase would be made inside or outside the restaurant. Ultimately, it became clear that Thomas was not coming into the restaurant with the money and Officer Romano gave the other officers in the area the arrest signal. DeLuca was arrested first in the alley outside the restaurant. Upon seeing this, Indihar told Thomas, "Sonny just got popped." Thomas and Irvin immediately sped away in their Buick. Two Task Force officers blocked off a portion of the street with their vehicle to stop Thomas' Buick. The officers got out of their vehicle, identified themselves as police officers and

ordered Thomas to stop. Instead, Thomas picked up speed and drove around the officers, hitting the officers' vehicle, running over an officer's foot and colliding with a parked vehicle in the process. The officers returned to their vehicle and pursued Thomas and Irvin, who were traveling at approximately 40 or 50 miles an hour. Ultimately, Thomas stopped the car and he and Irvin tried to escape on foot, but police officers apprehended them.

After the arrest the officers searched Thomas' Buick and discovered a hidden compartment, from which they recovered a number of items: 1) a brown paper bag containing $20,000, 2) a loaded Davis Industry .22 caliber handgun, 3) a scale commonly used to measure drugs, and 4) plastic bags and packaging consistent with breaking down a kilo of cocaine into smaller quantities. A subsequent vacuum sweep of the car revealed cocaine residue in the compartment as well.

On February 28, 2001, a grand jury returned a three-count indictment against Thomas and the three co-conspirators. Counts One and Two charged all four defendants with conspiracy to possess with intent to distribute cocaine and attempt to possess with intent to distribute cocaine. In addition, Count Three charged Thomas and Irvin with use of a firearm during and in relation to a drug trafficking crime.

Thomas was tried in a three-day bench trial. The district court admitted into evidence 18 tape-recorded phone conversations that Officer Romano had with Thomas and co-defendants DeLuca and Indihar. Although the tapes were made by Officer Romano, he was unable to testify at trial because he had been severely injured in a car accident. Instead, the government offered the testimony of Task Force Officer Edward Farrell to establish the foundation for the recordings. Officer Farrell testified that Officer Romano made the recordings in late May and early June, that the

recordings included conversations with Thomas as well as co-defendants Indihar and DeLuca, and that Romano used a cassette recorder and an earpiece in order to record his own voice and the incoming voice from the telephone. Farrell testified that after Romano made the recordings, the tapes were taken into DEA custody. Finally, Farrell testified that he and the other officers had prepared and reviewed the transcripts and that they were a true and accurate transcription of the tapes.

The government also offered the testimony of Indihar to establish the authenticity of the tape recordings. Indihar testified that he had listened to each tape, and that he recognized the voices on the tapes. Indihar was a party to many of the taped conversations and was present with Thomas for most of Thomas' taped conversation with Romano (although Indihar testified that he walked away from this conversation briefly). He identified the voices of Officer Romano, DeLuca, and Thomas, as well as his own voice. Indihar also explained in detail the content of the tapes and testified that the transcripts of the tapes accurately reflected the recordings. After this testimony, the government moved for the admission of the 18 tape recordings. Thomas' counsel objected to the admission of some of the tapes, arguing that Indihar's testimony did not establish a proper foundation because he was not a party to some of the conversations on the tapes. The district court overruled the objection, holding that there was a sufficient foundation for the tapes in which Indihar "was present, he talked, . . . or he was in the immediate presence and heard the conversations of the parties to the conversation or some of it at the time it was being recorded."

At the conclusion of the trial, the district court found Thomas guilty on all three counts of the indictment. Later, however, the court reversed the finding of guilty on Count Three, the firearm charge, holding that, although there was evidence that Thomas used a firearm in connection with the

drug offense, the evidence did not establish proof beyond a reasonable doubt. The court entered a finding of not guilty on that count.

At sentencing, the district court increased Thomas' base offense level two points, pursuant to section 3C2.1 of the Sentencing Guidelines, based on a finding that Thomas recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing law enforcement. In addition, the court determined that Thomas possessed a firearm during the drug offense, and accordingly increased his offense level two points under section 2D1.1(b)(1) of the Guidelines. Thomas was sentenced to 102 months on each of Counts One and Two, to run concurrently. He appeals his conviction and sentence.

## ANALYSIS

### A. Admissibility of Tapes

Thomas first argues that the district court erroneously admitted tape recordings, specifically Tape Recording 9, into evidence at trial without proper foundation or authentication. We generally review a district court's evidentiary rulings for an abuse of discretion. *United States v. Hunt*, 272 F.3d 488, 494 (7th Cir. 2001). Because of the great deference we give to a trial judge's evidentiary rulings, we will not reverse unless the record contains no evidence on which the trial judge rationally could have based its decision. *United States v. Gajo*, 290 F.3d 922 (7th Cir. 2002).

Tape Recording 9 contains a conversation between Thomas and Romano, in which Thomas is heard setting up a location to meet Officer Romano for the purchase of the cocaine, as well as a discussion of the terms under which Thomas will be permitted to test the quality of the cocaine. Thomas first contends that the district court erred

in admitting the tape because Indihar, the government's primary foundation witness, was not a participant in the recorded conversations. Moreover, Thomas argues that Indihar was only present for part of the conversation with Romano and the government, therefore, failed to establish that the tape recording was a true, accurate and authentic verison of the actual conversation between Thomas and Romano. We disagree.

Under Rule 104(a) of the Federal Rules of Evidence, "[p]reliminary questions concerning the admissibility of evidence shall be determined by the court," and such matters must be established by a preponderance of proof. FED. R. EVID. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). *See also United States v. Martinez De Ortiz*, 907 F.2d 629, 631 (7th Cir. 1990) (en banc). It is well-settled that a party offering a tape recording into evidence must prove that the tape is a true, accurate and authentic recording of the conversation between the parties involved. *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001). This standard can be established in two ways: a chain of custody showing that the tapes are in the same condition as when recorded, or other testimony to demonstrate the accuracy and trustworthiness of the evidence. *United States v. Rivera*, 153 F.3d 809, 812 (7th Cir. 1998). In this circuit, the authenticity and accuracy of a tape recording can be established through eyewitness testimony of the events in question. *United States v. Brown*, 136 F.3d 1176, 1182 (7th Cir. 1998).

In this case, Indihar listened to the tapes, identified the voices of Thomas and Officer Romano, as well as his own, and testified that the tapes did, in fact, accurately reflect the recorded conversation. It is undisputed that Indihar was sufficiently familiar with the voices of Thomas and Romano to enable him to authenticate the recorded conversations. Moreover, during the conversation, Indihar stepped away from Thomas only briefly but remained in the

immediate vicinity. Thus, Indihar served as a competent witness for the authentication of the tape.

Thomas argues that the government did not prove that the tape was not altered, but "merely raising the possibility (however hypothetical) of tampering is not sufficient to render evidence inadmissible." *Brown*, 136 F.3d at 1182. Further, Officer Farrell testified as to the manner in which the tapes were recorded and stored. The district court was satisfied that the government put forth the proper foundation for the admissibility of the tapes. We are satisfied as well that no extraordinary circumstances exist to disturb the district court's decision to admit the tapes into evidence.

In addition, Thomas asserts that the government failed to present adequate evidence of chain of custody, but so long as other evidence is sufficient to establish the accuracy and authenticity of the tapes, lack of proof regarding a chain of custody does not render tapes inadmissible. *United States v. Craig*, 573 F.2d 455, 478 (7th Cir. 1977). When chain of custody is called into question without any evidence of tampering, and if the tapes were in official custody at all times, a presumption arises that the tapes were handled properly. *United States v. Scott*, 19 F.3d 1238, 1245 (7th Cir. 1994). We believe that the testimony of both Officer Farrell and Indihar gave the district court ample evidence to find that the government provided an adequate foundation for the admission of the tape recordings.

## B.  Firearm Enhancement

Thomas next submits that the district court erroneously enhanced his sentence for possessing a firearm during a drug offense. Section 2D1.1 states that the offense level for a drug crime must be enhanced by two levels "if a dangerous weapon including a firearm was possessed." U.S.S.G. § 2D1.1(b)(1). Thomas was acquitted of the charge

of possession of a firearm during and in relation to a drug transaction crime in violation of 18 U.S.C. § 924(c). Thomas asserts that because he was acquitted of the gun possession charge, it was improper for the district court to punish him for this conduct by enhancing his sentence. We review for clear error. *United States v. Watson*, 189 F.3d 496, 501 (7th Cir. 1999); *United States v. Covarrubias*, 65 F.3d 1362, 1370 (7th Cir. 1995).

At the outset, it is clear that an acquittal on a firearms charge does not bar the imposition of a sentence enhancement based on the same conduct. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (holding that a sentencing court can consider conduct of which a defendant has been acquitted as long as that conduct has been proven by a preponderance of the evidence); *United States v. Booker*, 115 F.3d 442, 444 (7th Cir. 1997) (holding that acquittal of using or carrying a firearm in connection with drug offense did not "acquit" defendant of sentencing enhancement in connection with drug crime); *United States v. Pollard*, 72 F.3d 66, 68 (7th Cir. 1995) (holding that the acquittal on a § 924(c) charge does not prohibit invoking the weapon enhancement under § 2D1.1(b)(1) of the Guidelines). The acquittal only means that the government "failed to establish culpability beyond a reasonable doubt," not that the defendant did not commit the act. *United States v. Fonner*, 920 F.2d 1330, 1332 (7th Cir. 1990). In order to impose the firearm enhancement, the sentencing judge need only be convinced by a preponderance of the evidence that the defendant engaged in the conduct. By contrast, to establish a criminal conviction, the government must prove the use of the firearm beyond a reasonable doubt. *Booker*, 115 F.3d at 444 (stating that the standards of proof and persuasion differ for 18 U.S.C. § 924(c) and section 2D1.1(b) of the Guidelines); *United State v. Chandler*, 12 F.3d 1427, 1434 (7th Cir. 1994) (holding that the burden of proof for the sentencing enhancement is less stringent than for a

conviction). Accordingly, it is well within the discretion of the district court to consider this conduct and the acquittal on the criminal charge is irrelevant.

Having established that the acquittal does not preclude the enhancement, we still must review for clear error the district court's factual finding that the defendant possessed a firearm in connection with these drug offenses. *Chandler*, 12 F.3d at 1435. Application Note Three to section 2D1.1(b) states, "the adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b), cmt. n.3. Actual possession of the firearm need not be established in order to trigger the enhancement. *Covarrubias*, 65 F.3d at 1371. Instead, proof of constructive possession, that is, that the defendant had the power and the intention to exercise dominion or control of the firearm, is sufficient to warrant the enhancement. *Id.* An enhancement under section 2D1.1(b)(1) can be imposed even for "simple, and entirely passive, possession" of a firearm. *Booker*, 15 F.3d at 443.

The district court imposed the two-point enhancement reasoning that "it is quite often the case that where drug transactions take place there are also weapons and other forms of security to . . . protect both the participants and the product" and, in this case, the weapon was found "in such close proximity to the money and the place where drugs had been transported before." As a result, the court held it was not clearly improbable that the weapon was connected to the offense. This finding by the district court was not clearly erroneous. Before he fled from his car, Thomas was in the driver's seat. After Thomas was arrested, officers recovered from a hidden compartment in his car a loaded handgun, $20,000, a scale for measuring drugs and plastic bags for breaking cocaine into smaller measurements. A further sweep of the compartment also revealed cocaine residue. The record clearly supports the district court's conclusion that Thomas had knowledge of and

control over the firearm in the car in the process of committing a drug offense. *Chandler*, 12 F.3d at 1435 (upholding firearm enhancement where police found pistol on front seat of defendant's car shortly after defendant sold crack cocaine to detective). Moreover, the weapon was recovered from the same compartment as the money for the drug purchase. The "proximity of a weapon to drug proceeds provides a sufficient nexus to conclude that it was not clearly improbable that the gun was connected with the offense." *United States v. Johnson*, 227 F.3d 807, 814 (7th Cir. 2000) (internal quotations omitted). Accordingly, it was not clear error for the district court to impose the enhancement. *Id.*

## C. *Reckless Endangerment Enhancement*

Finally, Thomas argues that the district court erroneously enhanced his sentence for reckless endangerment pursuant to section 3C1.2 of the Guidelines. Again, we review for clear error. *Watson*, 189 F.3d at 501.

To establish that a defendant's sentence should be enhanced for reckless endangerment, the government must show that the defendant (1) recklessly, (2) created a substantial risk of death or serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer. U.S.S.G. § 3C1.2; *Watson*, 189 F.3d at 502. The Guidelines define recklessness as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. §§ 2A1.4 cmt. n.1, 3C1.2, cmt n.2. Section 3C1.2 does not require that the defendant's acts cause actual injury, only that the defendant's behavior posed the risk for injury to others. U.S.S.G. § 3C1.2, cmt. n.6.

Thomas' flight from the officers satisfies this legal standard. After becoming aware that DeLuca was arrested, Thomas immediately sped off in his car in a clear attempt to avoid being apprehended. The officers identified themselves to Thomas and demanded that he stop his vehicle. Instead, Thomas picked up speed, traveling through a residential neighborhood at a speed of up to 50 miles an hour. He led police on a high-speed chase and in the process, his vehicle hit a police vehicle, ran over an officer's foot and collided with another car on a residential street. These acts posed a danger to the officers and innocent bystanders, and fall squarely within the scope of section 3C1.2. *See Watson*, 189 F.3d at 502; *United States v. Woody*, 55 F.3d 1257, 1274 (7th Cir. 1995) (holding that flight from police and high-speed chase is sufficient to warrant a section 3C1.2 enhancement); *United States v. Velasquez*, 67 F.3d 650, 655 (7th Cir. 1995) (holding that flight from the scene at a high rate of speed on a residential street is enough to support an enhancement under section 3C1.2). Thomas created a substantial risk of serious bodily injury in his attempt to avoid arrest and flee the officers. The district court's imposition of a two-point enhancement under section 3C1.2 was not clear error.

## CONCLUSION

We AFFIRM Thomas' conviction and sentence.

A true Copy:

　　　　Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-97-C-006—6-26-02