In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3092

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONNIE E. LARD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:02-CR-00004-RM—**Robert L. Miller, Jr.**, *Chief Judge.*

ARGUED MARCH 5, 2003—DECIDED APRIL 24, 2003

Before MANION, DIANE P. WOOD, and EVANS, *Circuit Judges.*

PER CURIAM. Ronnie Lard pleaded guilty to possessing a sawed-off rifle as a convicted felon, 18 U.S.C. § 922(g)(1), brandishing the rifle during and in relation to an attempted robbery, *id.* § 924(c), and possessing the rifle though it was not registered to him, 26 U.S.C. § 5861(d). Lard received 76 months' imprisonment on both the first and third counts plus a 120-month term on the second count—all three sentences to run consecutively. His appeal presents the single question of whether the district court properly imposed an upward adjustment for reckless endangerment during flight. U.S.S.G. § 3C1.2. Because

the district court did not commit clear error by imposing the adjustment, we affirm.

At four o'clock in the morning on October 8, 2001, Lard walked into the Village Pantry in Mishawaka, Indiana, leveled a 9mm Hi-Point carbine rifle with a shortened barrel at a store employee and the employee's friend, and ordered the pair to get into the bathroom and lock the door. Lard then hitched his pickup truck to the store's ATM with a logging chain and attempted to remove the machine. Lard was momentarily sidetracked when a prospective customer drove up and asked what he was doing, but Lard scared the customer away by grabbing his rifle from the truck's cab, pointing it at the customer, and threatening to kill him.

In the meantime, the store employee and his friend had climbed through the bathroom ceiling into the office, where they called 911. When the police arrived, they saw Lard in the store holding his rifle. Lard then ran behind the store into the woods, which in parts were "heavily weeded." Officers pursued with guns drawn, and a police dog eventually cornered Lard. By then he had discarded his gun, which Sergeant Steve Treber eventually located and retrieved from an area of undergrowth that witnesses described as a "briar patch." As Sergeant Treber pulled the gun from the briar patch, the weapon discharged—fortunately causing no injuries.

At sentencing the district court heard testimony from Lard and ATF Special Agent Sean Skender, who had not been to the crime scene but was assigned to investigate the attempted robbery. Lard testified that he had discarded the gun because he wanted to avoid a "confrontation" with pursuing officers. He denied having pulled the action on the rifle to move a bullet from the magazine into the chamber. And he said that he was waiting in a squad car when Sergeant Treber found the rifle but did

not hear the gun discharge. Agent Skender, in contrast, testified that Treber had told him that the gun went off when he picked it up, so ammunition must have been in the chamber. On cross-examination, however, Skender conceded that he did not know whether Treber retrieved the gun carefully and that none of the written reports prepared by officers on the scene mentioned a discharge.

Rejecting Lard's argument that the gun never went off, the district court concluded that Lard had recklessly endangered the officers as he fled by tossing his rifle into a briar patch. The court accordingly adjusted Lard's offense level upward by two levels. U.S.S.G. § 3C1.2. The court also imposed upward adjustments because Lard restrained his victims in the bathroom, *id.* § 3A1.3, and because Lard obstructed justice by providing phony information to the arresting officers, *id.* § 3C1.1. The court then denied Lard's request to depart downward to bring his criminal history category in line with his criminal background. *Id.* § 4A1.3.

On appeal Lard argues only that the district court improperly adjusted upward for reckless endangerment, a move that increased his maximum guideline range by 31 months. Application of a reckless-endangerment adjustment is a factual finding that we review for clear error. *United States v. Thomas*, 294 F.3d 899, 906 (7th Cir. 2002). The adjustment is warranted where "the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. To obtain the adjustment the government must show that the defendant did more than merely flee; the guideline requires "additional conduct" that creates a substantial risk of serious injury. *United States v. Reyes-Oseguera*, 106 F.3d 1481, 1483 (9th Cir. 1997); *see also United States v. Hagan*, 913 F.2d 1278, 1284-85 (7th Cir. 1990) (same rule prior to the enactment of § 3C1.2).

The government does not argue that simply discarding a loaded weapon warrants the adjustment but instead points to two additional factors that, it says, support imposing the adjustment here. First, the government contends that by tossing the rifle into a briar patch, Lard created a substantial risk that the gun would discharge—as it actually did—when pursuing officers tried to retrieve it. Second, the government argues that regardless of where the weapon landed, Lard created a risk that the rifle would fire simply by throwing it with a round in the chamber and the safety off.

We question whether the government's evidence that Lard abandoned his gun in a briar patch was enough by itself to establish that the adjustment was warranted. It is unclear, for example, if Lard had any idea where he left his gun as he ran through the woods in the dark. And the government needed to show that Lard was aware that he had created a substantial risk of injury by discarding the weapon and nonetheless disregarded that risk. U.S.S.G. § 3C1.2, comment. (n.2); *id.* § 2A1.4, comment. (n.1). It is of course true that simply leaving a weapon in a public place can amount to reckless endangerment. The Tenth Circuit recently made this point in *United States v. Brown*, 314 F.3d 1216 (10th Cir. 2003)—a case in which a fleeing defendant dropped his handgun outside an apartment complex where children were getting off a school bus. *Id.* at 1221. But unlike *Brown* there is no evidence here that the public could easily access the briar patch. Indeed, Agent Skender testified that the briar patch was in a "wooded area" behind the Village Pantry, and nothing in the record shows the location of this wooded area in relation to the store.

Still, the government insists that because the gun actually discharged when Sergeant Treber picked it up, the district court could reasonably infer that the briar patch was an unsafe place to leave a weapon. To create that

inference, however, the government needed to introduce some evidence about dangerous features of the briar patch—which it failed to do. There is no evidence, for example, that the gun discharged because the trigger snagged on the briars and not because of a malfunction or Sergeant Treber's negligence. Treber did not testify at the sentencing hearing, nor did the government attempt to elicit through hearsay any specifics about the rifle's recovery. And Agent Skender, who did testify, conceded that he did not know if Treber acted carefully. In short, nothing in the record explains why the gun went off. By all appearances, the gun might have been just as likely to discharge if the police had ordered Lard to drop the weapon, and he had heeded their command.

Nonetheless, the district court also found that Lard threw the rifle with a round in the chamber and the safety off. Lard in his opening brief makes no argument that these findings were clearly erroneous. He says in his reply that no one saw him discard the rifle and so there is no evidence that he "threw" the weapon. But on cross-examination the prosecutor asked, "And you threw this firearm away from your person knowing it was loaded at the time you threw it," to which Lard responded, "Yes, I did." Lard introduced no evidence to clarify that what he meant to say is that really he had gently set the gun down, even though his attorney recognized the government's characterization and argued to the district court that Lard "could have been setting [the gun] down."

On the question of whether throwing a gun with a round in the chamber and the safety off is dangerous enough to justify an adjustment under § 3C1.2, we have found no published appellate decisions. Clear error, however, is a deferential standard. The district court needs to adopt only a permissible view of the evidence. *See United States v. O'Brien*, 238 F.3d 822, 825 (7th Cir. 2001); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

On this record the district court could reasonably have inferred that throwing a rifle, which was fully capable of firing, could actually cause the gun to go off when it hit the ground, thus creating a risk of serious injury to pursuing officers. Agent Skender said as much at the sentencing hearing, testifying that he would never throw a loaded firearm because of the risk that it would discharge.

Additional information might have weakened the inference. For example, evidence of the force with which Lard threw his rifle (the district court declined to find "whether that was a short toss or a long toss") and the likelihood that the force would cause the rifle to discharge might have shown the degree of risk to be slight. *Cf. United States v. Smith*, 210 F.3d 760, 763-64 (7th Cir. 2000) (holding that the risk created by throwing dangerous chemicals out of a car at pursuing officers depends on the chemicals' quantity and concentration). But absent such evidence the district court's assessment of the risk was not implausible. The court therefore did not commit clear error, and its judgment is

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*