**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Miguel GONZALEZ–RANGEL,**
**Defendant–Appellant.**

**No. 01–1870.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 16, 2002.

Decided April 16, 2003.

Before BAUER, COFFEY, and WILLIAMS, Circuit Judges.

### ORDER

Manuel Gonzalez–Rangel (referred to hereafter as "Rangel") plead guilty to one count of conspiracy to possess with intent to distribute in excess of five kilograms of cocaine and marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and three counts of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The trial court sentenced Rangel to concurrent terms of 235 months in prison on each of the counts, five years of supervised release to follow the term of imprisonment, as well as a $400 mandatory assessment. Rangel appeals from the sentencing court's determination that: (1) over 80 kilograms of cocaine was attributable to him as relevant conduct, (2) he possessed a dangerous weapon in connection with his drug charge and was thus subject to a dangerous weapons enhancement, and (3) he was not entitled to a sentencing adjustment for acceptance of responsibility. We affirm.

### I. Background

From early 1998 through December 1999 (his arrest), Rangel supplied illegal drugs (cocaine and marijuana) to a local drug ring in Milwaukee, WI. The drug

trafficking outfit for which Defendant served as a "source," was run by Julio Lopez, and was comprised of a number of Julio's extended family members, namely, Julian, Arturo, Hector, Ernesto, Eddie, Roberto and Jose (his brothers), as well as his sister, Aurora Lopez, and his nephew, Arthur Lopez, Jr. ("Junior") (together, the "Lopez family" or "Lopez conspirators"). The Lopez family obtained marijuana and cocaine products from Rangel, as well as other sources located in Illinois and Texas, and then repackaged and sold the drugs in the area of Milwaukee known as "8th and Madison." Rangel, for his part, often transferred cocaine and marijuana drugs to Lopez family members out of his tavern, "Los 2 Compadres," or, alternatively, straight out of his car.

On October 9, 1999, at around 3:00 a.m., officers of the Milwaukee Police Department were dispatched to Defendant's tavern, in response to a report that a man with a gun was beating up a woman inside of a green Camaro. Upon arriving at the scene, officers found Rangel in the driver's seat and a woman in the passenger's seat of Defendant Rangel's automobile (Camero). Officers recovered a nine-millimeter handgun from the floor of the driver's side, a loaded nine-millimeter magazine from the floor under the front passenger's seat, and nine corner-cut bags of cocaine, from between the driver's seat and the center console. In his statement to police that evening, Rangel admitted that he owned the car, as well as the firearm found on the floor of his car, but claimed that he did not know how the drugs came into his possession.

An indictment was issued and search warrants executed in connection with the Lopez drug ring and, on December 15,

1999, Rangel was arrested on the following charges: (1) conspiracy to possess with intent to distribute in excess of five kilograms of cocaine and marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (one count), and (2) distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (three counts). Inside Defendant's home, on the day of arrest, agents uncovered the storage box for the nine-millimeter gun owned by Defendant and found in his possession the prior October (matching serial numbers). Agents also arrested coconspirators Arturo, Aurora, Hector, Eddie, Roberto and Luis Lopez, as well as Luis Acevedo and Esteban Alvarado, and uncovered a large cache of firearms, ammunition, and firearm-related paraphernalia from their residences.

Rangel subsequently plead guilty to the conspiracy to distribute cocaine and marijuana charge, as well as the three distribution of cocaine charges.[1] At his sentencing hearing, Defendant Rangel maintained that only 15–50 kilograms of cocaine was attributable to him, while the Government contended that he was actually responsible for over 80 kilograms of cocaine.

To support its proffer regarding Defendant's relevant conduct, the Government relied on statements from cooperating coconspirators set forth in the pre-sentence report. As reflected in that report, Ernesto Lopez informed investigators that, over the course of the Lopez's drug operations, Defendant supplied him (Ernesto) with around 1,000 pounds of marijuana and 40–50 kilograms of cocaine. According to Ernesto, the defendant also supplied illegal drugs to other Lopez family members, including Junior, Jose and Julian. Ernesto, having personally observed Rangel deliver cocaine and marijuana to Junior every three days for an entire year (1999),[2] esti-

---

1. Rangel, when entering his guilty plea, did not have the benefit of a plea agreement.

2. As far as the amounts changing hands during these transactions, Ernesto estimated that

mated that the total amount Rangel had sold to Junior over the course of the conspiracy was over 40–50 kilograms of cocaine.[3]

Ernesto's identification of Rangel as a major supplier to the Lopez family was corroborated by the statements of nearly a dozen other co-conspirators, including Hector Lopez, Estevan Alvarado, Mark Bowie, and Mario Reyes, just to name a few.[4] Hector Lopez, for example, informed investigating agents that, based on his own observations, Rangel "regularly" supplied Junior and Ernesto with one-half to one-kilogram quantities of cocaine. Pre-sentence Report ¶ 68. Esteban Alvarado (another co-conspirator who was not a member of the Lopez family) stated that he had personal knowledge that "various" Lopez family members obtained "pounds of marijuana" and "up to kilogram quantities of cocaine" from Rangel.[5] Id. ¶ 88.

Mark Bowie, who was arrested in August of 2000 on unrelated charges, also participated in the Lopez's drug-trafficking activities. Bowie informed investigators that, after Julian and Arturo got into a dispute with one of their other suppliers in 1997, they began obtaining drugs from Rangel, in multiple-pound (marijuana) and one-half kilogram (cocaine) quantities. Bowie recounted that he also, on occasion, personally observed both Ernesto and Jose consummate illegal drug transactions with Rangel.

Lastly, Mario Reyes, a friend of Junior Lopez who was familiar with the Lopez's drug-trafficking scheme, pegged Rangel as a "source of supply" for the Lopez family, and noted that, in 1999, he (Reyes) had accompanied Eddie, Junior, and other Lopez family members, to the Defendant's tavern to purchase illegal drugs from Defendant.

The pre-sentence report also recorded a number instances of controlled purchases of cocaine and marijuana involving Rangel, executed both by undercover agents and confidential informants. Such "controlled buys" took place on April 22, 1999 (three to four ounces of cocaine), April 27, 1999 (two pounds of marijuana), May 25, 1999 (two ounces of cocaine), July 1, 1999 (nine ounces of cocaine), November 11, 1999 (four ounces of cocaine), and December 1, 1999 (three ounces of cocaine). In each instance, Rangel either delivered the drugs to the purchaser himself, or delivered the drugs to an intermediary (one of the Lopez brothers) who then sold the drugs to the informant or undercover agent. Each of the controlled buys took place inside Rangel's tavern, or outside the tavern in the parking lot. During one such drug deal, the confidential informant recorded his conversation with Defendant on tape, and captured Defendant boasting that he "supplied" cocaine for "Junior and other Lopez family members." Pre-sentence Report ¶ 182.

---

the largest delivery he observed was two kilograms of cocaine and 100 pounds of marijuana.

3. Thus, based on Ernesto's statements, the total amount attributable to Defendant was in excess of 80–100 kilograms.

4. In addition to these cooperating witnesses, Clinton Lampshire, Luis Acevedo, Alex Medina, Milo Ocasio, Frank Lopez, and two confidential informants ("C14" and "C14") identi-

fied Rangel as a drug supplier for the Lopez family. Luis Acevedo specified in an interview that Rangel was a supplier of "a lot of cocaine and marijuana" for the Lopez family. Presentence Report ¶ 42.

5. For instance, in 1999, Alvarado himself drove Junior to Rangel's tavern on an occasion when Junior purchased 15 pounds of marijuana from Rangel. Presentence Report ¶ 88.

Based on the evidence of the Defendant's drug distribution activities set forth in the pre-sentence report, the sentencing court assessed over 80 kilograms of cocaine to Rangel as relevant conduct. In light of his October 9, 1999 possession of the nine-millimeter handgun, the sentencing court also concluded that Rangel was eligible for an enhancement for possession of a dangerous weapon in connection with his drug offense. And, finding that Rangel made a frivolous objection to the gun enhancement, the district court refused a downward departure for acceptance of responsibility.

*II. Analysis*

*1. Drug amount*

The sentencing court credited the plethora of statements given by co-conspirators implicating Rangel as a major source of drugs for the Lopez family, and, finding such statements reliable, concluded that Rangel was responsible for over 2,000 pounds of marijuana, and over 80 kilograms of cocaine. Sent. Tr. at 52. We review the district court's determination for clear error, *United States v. Spiller*, 261 F.3d 683, 691 (7th Cir.2001), and will affirm the court's decision unless, after considering all of the evidence, we are left with a "definite and firm conviction that a mistake has been committed." *United States v. Huerta*, 239 F.3d 865, 875 (7th Cir.2001).

■ Rangel argues that the district court erred insofar as it based its calculations of the drug quantity "solely on the statements of co-defendants contained in the [pre-sentence report]." Rangel's Br. at 9. Specifically, Defendant complains that the "primary source" of information regarding the drug quantities (Ernesto Lopez) was a "cooperating co-defendant," and criticizes the district court for "fail[ing] to make any findings as to why information

from Ernesto Lopez or anyone else was reliable." *Id.* at 14.

Defendant primarily relies on *United States v. Palmer*, 248 F.3d 569 (7th Cir. 2001) to support his argument for reversal of the sentencing court's drug quantity assessment. In *Palmer*, after the defendant plead guilty to a small amount of crack (4.7 grams), the sentencing court attributed more than 150 grams of crack to the defendant as relevant conduct. The court's assessment of the drug amount was based in part on the testimony of a United States marshal, who testified that a third party, Griffin, who was not available to testify in court, had attributed 241 grams to the defendant. In an opinion reversing the sentencing court, we voiced "serious concerns" as to the sentencing court's reliance on the marshal's testimony, given that the particular drug transaction to which he testified was over two years old, and also because the sentencing court made no specific finding of credibility as to the individual (Griffin) who actually had first-hand knowledge of the incident (crack sale).

The circumstances warranting reversal in *Palmer* are simply not present here. Unlike in *Palmer*, the sentencing court in this case *did* make an express finding of credibility as to the co-conspirators' testimony regarding Rangel's relevant conduct. Ultimately, the court concluded that the co-conspirators' statements (including that of Ernesto) regarding Defendant's drug-dealing activities were "believable because [they were] consistent." *Id.* at 59.

Moreover, although the statements of Rangel's co-conspirators were presented to the court in the pre-sentence report, rather than by way of in-court testimony, evidence regarding a defendant's relevant conduct need not be presented as live testimony to be relied upon by the sentencing court. *See United States v. Simmons*, 218

F.3d 692, 695 (7th Cir.2000) ("there is no requirement that a sentencing court consider only the testimony of nonhearsay witnesses"). As we have previously held, a sentencing judge may "consider a wide range of information" in determining the attributable drug amount, so long as the information has " 'sufficient indicia of reliability to support its probable accuracy.' " *United States v. Robinson*, 164 F.3d 1068, 1070 (7th Cir.1999) (quoting *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir.1995)). Here, the co-conspirators' statements contained in the pre-sentence report *were* sufficiently reliable because they were both numerous and thoroughly "consistent." Sent. Tr. at 59. Nearly a dozen co-conspirators supported Ernesto's claim that the Defendant was a "major" supplier of cocaine and marijuana to the Lopez family.[6]

As the sentencing judge rightly noted, the Government's burden at sentencing "is only to ... establish the drug quantities by a preponderance of the evidence." Sent. Tr. at 54. *See United States v. Joiner*, 183 F.3d 635, 640 (7th Cir.1999). In this case, instead of presenting evidence to refute the testimony in the pre-sentence report, Defendant fell back on bare criticism, baselessly attacking the credibility of his co-conspirators and their assertions regarding his drug activities-this was insuffi-cient to tip the scales of the evidence in his favor. *See, e.g., United States v. Simmons*, 218 F.3d 692, 695 (7th Cir.2000) (noting that it is "not enough" to deny the accuracy of a pre-sentence report, one must present actual evidence to counter the evidence set forth therein).[7]

In light of the sheer number of witnesses-eleven co-conspirators in all-that testified Rangel as his or her or their regular source of cocaine and marijuana for the Lopez family, as well as various other evidence in the pre-sentence report (controlled purchases of cocaine, the Defendant's admission that he was a "supplier" to Junior and other Lopez family members), there was ample evidence corroborating Ernesto Lopez's assessment that, over the course of the conspiracy, Rangel was responsible for over 80 kilograms of cocaine. Because Ernesto's statement regarding Defendant's drug-trafficking quantities bore the requisite indicia of reliability, and because Defendant presented no evidence to refute Ernesto's corroborated testimony, the district court did not err in accepting his assessment as to the amount of drugs attributable to Defendant.

## 2. Possession of a dangerous weapon

Defendant also appeals from the sentencing court's determination that he was

---

**6.** It is worth noting that an additional point of distinction between this case and *Palmer* is that the information provided by the cooperating witnesses in this case was in regard to Defendant's *ongoing conduct*—that is, drug activities that took place over a period of years and continued up until the point of Defendant's arrest. Thus, the information was not (as was the case in *Palmer*) concerning a *single* drug transaction that occurred *two years prior* to the statement itself. In light of the familiarity of the co-conspirators with Defendant and his drug business, formed after their *repeated* interactions and drug transactions with Defendant, the statements of Defendant's co-conspirators in this case are more significantly more reliable than the analogous statement at issue in *Palmer*.

**7.** Defendant did attempt to counter the pre-sentence report's evidence of the extent of his drug activities by presenting the testimony of his former employer, who opined that he was an "outstanding" worker, Sent. Tr. at 14–16, and testimony of his brother, who testified to Defendant's poor financial condition, Sent. Tr. at 18–20. But neither of these statements directly contradicted the evidence of the amount of drugs for which Defendant was accountable provided by Defendant's co-conspirators, leaving the information in the pre-sentence report uncontradicted at sentencing.

eligible for a sentencing enhancement because he possessed a dangerous weapon in connection with a drug offense. U.S.S.G. § 2D1.1(b)(1). We review the court's decision to impose a § 2D1.1 enhancement for clear error. *United States v. Watson,* 189 F.3d 496, 501 (7th Cir.1999).

■ The Sentencing Guidelines require a court to increase a defendant's offense level by two levels if the defendant possessed a dangerous weapon in connection with a drug offense. *See* U.S.S.G. § 2D1.1(b)(1). A weapon found in "close proximity" to illegal drugs is presumptively considered to have been used in connection with the drug trafficking offense. *United States v. Grimm,* 170 F.3d 760, 767 (7th Cir.1999). Thus, the initial burden is on the Government to demonstrate that the defendant "possessed a weapon in a place where drugs were present." *Grimm,* 170 F.3d at 767. Thereafter, the burden shifts to the defendant to show that it was "clearly improbable" that the weapon was connected with the offense. *Id.*

The Defendant admits that the Government's initial burden was met, and with good reason. After all, when the police took Defendant into custody on October 9, 1999, he was clearly in possession of a nine-millimeter handgun (floor of his car), as well as nine corner-cut bags of cocaine (between the driver's seat and center console of his car). Plea Tr. at 38. Nevertheless, he argues that he should not have been subject to a dangerous weapons enhancement because he presented a "plausible" explanation for his possession of the gun-namely, that he used the gun *purely*

to protect his tavern,[8] rather than for drug-trafficking purposes. *See* Rangel's Br. at 16. He also claims that he had no knowledge that the cocaine was in his car on the night of October 9.

Unfortunately for Rangel, his dubious (though perhaps "plausible") explanation for possessing a handgun did not make it "clearly improbable" that he had used the gun in connection with illegal drug sales. As an initial matter, the location from which the police recovered the gun—Rangel's car—was itself the site of a number of his prior drug deals.[9] This may explain why, on the night that the police discovered Rangel to be in possession of the handgun, he was *also* in possession of several bags of cocaine-packaged in "corner cuts," a popular method of distribution. *See* Sent. Tr. at 29 (noting that "the way the drugs were packaged [wa]s consistent with resale ...."). Additionally, we note that the type of gun Defendant possessed—a handgun—and the fact that it was concealed by Defendant (on the floor of the car) also serve to bolster the Government's claim that the gun was used by Defendant in connection with illegal activity (drug trafficking), rather than for the lawful purpose of protecting the tavern. *See, e.g., United States v. Cantero,* 995 F.2d 1407, 1411 (7th Cir.1993) ("We have previously noted that a handgun is a 'tool of the [drug] trade,' because it is easy to conceal yet deadly.").

Moreover, even if we accept Rangel's argument that he used the gun to protect his tavern, the fact that his tavern often

---

8. The Defendant's sole evidentiary support for this proffer was the testimony of his brother, Antonio, that Defendant said he wanted to buy the gun because he was "afraid that something might happen in the bar ...". Sent. Tr. at 21.

9. For example, on April 27, 1999, when agents purchased marijuana from Jose Lopez, Jose obtained the marijuana from Rangel while sitting inside Defendant's Camaro. Pre-sentence Report ¶ 167.

doubled as a drug-distribution location[10] makes it *highly unlikely* that he *at no point* used the gun to guard his drugs or to otherwise further his drug trade. Thus, we agree with the sentencing court's conclusion that, under the totality of the evidence, it was *not* "clearly improbable" that Defendant used the handgun in connection with the charged drug offenses. Sent. Tr. 34–35 ("the facts ... overwhelmingly ... support ... that the weapon ... found in [Defendant's] automobile was used in connection with a drug transaction."). The § 2D1.1 dangerous weapon enhancement was properly imposed by the court.

### 3. Acceptance of responsibility

Under the Sentencing Guidelines, a court may reduce a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense...." U.S.S.G. § 3E1.1. The court below refused to reduce Defendant's sentencing level on the basis that Defendant "raised a frivolous objection to the evidence showing that he had a gun in connection with a drug transaction...." Sent. Tr. at 54–55. We review for clear error. *United States v. Grimm,* 170 F.3d 760, 766 (7th Cir.1999).

■ Rangel argues that he was entitled to a § 3E1.1 reduction because he entered a timely plea of guilty as to the charges brought against him by the Government. While entering a guilty plea may help a defendant establish his entitlement to an acceptance of responsibility credit, it does *not automatically entitle him to such*

credit. *United States v. McIntosh,* 198 F.3d 995, 999 (7th Cir.2000). Indeed, in cases where the "defendant ... falsely denies, or frivolously contests, relevant conduct that the court determines to be true ...", the sentencing court may refuse application of the sentencing reduction. *Id.* n. 3. Thus, "[a]lthough a defendant is free to challenge the Government's proffer of relevant evidence, doing so 'exposes his denials to the scrutiny of the court,'" *Booker,* 248 F.3d at 691 (quoting *United States v. Brown,* 47 F.3d 198, 204 (7th Cir.1995)).

Here, in spite of the mount of evidence linking his gun to his drug trade, Rangel steadfastly maintained to the sentencing court that he had never used his handgun in connection with drug-trafficking activity. But arguing as much was frivolous (not to mention foolish), given that, on October 9, 1999, he was found to be in possession of *both* the handgun *and* nine corner-cut bags of cocaine. Moreover, as discussed above, even if the Defendant had not been in possession of drugs on that particular occasion, his own admission that he used the gun to protect his tavern-a site of many of his cocaine deliveries-ultimately linked his gun to his drug trade in any case.

We agree with the district court that Defendant's refusal to own up to his reason for carrying a handgun was frivolous, and that it amounted to a waste of the district court's time and evidenced an unwillingness on the part of Defendant to truly accept responsibility for his crimes. The district court's refusal to apply the

---

**10.** On May 25, 1999, while inside his tavern, Defendant supplied Junior with two ounces of cocaine; Junior then sold the cocaine to a confidential informant, C12, as part of a controlled transaction. Pre-sentence Report ¶ 172. On November 11, 1999, Defendant sold four ounces of cocaine directly to the same confidential informant. On that occasion, in a tape-recorded conversation, Rangel instructed the informant to meet him at the tavern and, when the informant drove up to the tavern, Rangel emerged from the tavern to deliver the cocaine. *Id.* ¶ 182.

§ 3E1.1 downward adjustment was not in error.

Affirmed.